**Renee K. MOODY, Plaintiff,**

v.

**BLUE CROSS/BLUE SHIELD OF MICHIGAN, Defendant.**

**No. 1:96 CV 859.**

United States District Court,
W.D. Michigan,
Southern Division.

Jan. 27, 1998.

---

**1080**

Ronnie M. Strong, Strong & Williams, PLLC, Detroit, MI, for Plaintiff.

Bart M. Feinbaum, Blue Cross/Blue Shield of Michigan, Detroit, MI, for Defendant.

## OPINION

ENSLEN, Chief Judge.

This matter is before the Court on defendant's motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. On October 25, 1996, plaintiff Renee Moody filed this action claiming that defendant Blue Cross/Blue Shield of Michigan had: 1) discriminated against her because of her disability in violation of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101–12117; 2) discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and the Michigan Elliot–Larsen Civil Rights Act (MELCRA), M.C.L. §§ 37.2101–37.2103; and 3) retaliated against her for filing a charge against defendant with the Michigan Department of Civil Rights (MDCR) in violation of both the ADA and Title VII. Upon review, defendant's motion is granted.

## STANDARD

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A motion for summary judgment requires that the Court view the " 'inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion.' " *Matsushita Electric Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587 (quoting *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "The mere existence of a scintilla of evidence in support of plaintiff's position [however] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## FACTUAL BACKGROUND

Plaintiff Renee Moody began working for the defendant Blue Cross/Blue Shield (BC/BS) in 1981. In 1991, plaintiff was promoted to the position of Performance Evaluation Specialist (PES) at defendant's Cascade facility in downtown Grand Rapids, Michigan. According to plaintiff, "the primary function of a [PES] is to monitor the

quality of work performed by defendant's [Customer Service Representatives (CSR)]. Monitoring the work product of defendant's CSRs consist[s] of listening in on telephone conversations between CSRs and subscribers, and [] review[ing] the quality of [the] written work of CSRs." Pl. Br. in Opp. to Mot. for S.J. at 6. "The primary function of a [CSR] is to respond to written and verbal inquiries of defendant's customers as [they] relate to services provided by defendant BC/ BS. Inquir[i]es by defendant's customers consist of three methods[:] written, telephonic, and walk-in." *Id.*

Some time in early 1992, BC/BS relocated all of its PESs and CSRs from its Cascade facility to its new facility at 5540 Glenwood Hills Parkway, Grand Rapids, Michigan (Glenwood facility). In early 1993, plaintiff and a number of her coworkers began to experience upper respiratory problems and other symptoms which seemed to indicate a problem with the air quality within the Glenwood facility. Responding to the employees' complaints, BC/BS commissioned an indoor air quality study on March 4, 1993 to be conducted by BDN Industrial Hygiene Consultants, Inc. BDN concluded that, while there were somewhat increased levels of carbon dioxide in the building, the levels were well below the current Occupational Safety and Health Administration (OSHA) standards as were the levels of all other toxins for which BDN screened. Nevertheless, BDN proposed measures to address the employees' complaints which BC/BS followed.

Despite BDN's finding and the actions taken by defendant, after several months, plaintiff's symptoms had still not improved. BC/BS then commissioned an additional air quality study. On January 24 through 28, 1994, BDN conducted another field investigation of the Glenwood site and again concluded that its readings, which did include findings of carbon dioxide levels slightly above normal, did not pose any health risks. Despite this conclusion, the employees' discomfort and health problems persisted. BC/BS then banned smoking in the building, as well

as the use of any air fresheners or other items having a scent including perfumes, nail polishes, and hairsprays. BC/BS also installed fans in the area where plaintiff worked. Still, the employees' symptoms did not improve. Finally, BC/BS commissioned a third air quality study. After an investigation on May 12, 1994, BDN found that carbon dioxide levels had been reduced to normal and concluded that no further testing was necessary.

Again, despite the measures taken and the findings of BDN, plaintiff's condition continued to worsen. As a result, in late May 1994, plaintiff took a medical leave of absence. Soon thereafter, she was diagnosed with hyperactive airway disease.

On July 25, 1994, plaintiff returned to work at the Glenwood building. During her absence, yet another air quality study had been done, which had not revealed any air quality problems. Nevertheless, plaintiff again began experiencing severe symptoms. In fact, during her second day, plaintiff was forced to leave work to go to her physician's office. As a result of her renewed health problems, plaintiff returned to medical leave status after only a couple of days on the job.

Plaintiff remained on medical leave after that episode until October 1995. During that 14-month absence, although plaintiff was completely unable to work, Moody filed several requests for defendant to accommodate her by allowing her to work at BC/BS's Cascade facility as a Performance Evaluation Specialist (PES) handling only written work. The Cascade facility, however, had housed neither CSRs nor PESs since 1991 and her request was, therefore, rejected on November 17, 1994. On November 18, 1994, plaintiff filed a complaint with the Michigan Department of Civil Rights, alleging handicap discrimination in violation of the ADA.

In October 1995, BC/BS rehired[1] plaintiff as a CSR III at its Waters facility's walk-in center, but the Waters facility proved problematic for Moody as well. Again, plaintiff became ill. Consequently, plaintiff was temporarily relocated to the Cascade facility

1. Under the collective bargaining agreement reached by BC/BS and the union, once an employee has been on sick leave for more than five months, s/he is placed on pending Long Term Disability status and the company is permitted to fill that employee's job.

where she did clerical work until November 3, 1995. On November 3, plaintiff, who was still having some trouble breathing, went on leave once again.

During this period, defendant also offered to place plaintiff in a position in its Kalamazoo walk-in center. Plaintiff, however, rejected this offer as well, stating that her physician did not want her driving from Grand Rapids to Kalamazoo, since the automobile exhaust would exacerbate her condition.

Plaintiff continuously reiterated her request to be allowed to work in the Cascade facility doing written work only either as a PES or as a CSR. Once again, BC/BS reiterated that there were no positions for either PESs or CSRs at that location and that accommodating plaintiff's request would cost approximately $50,000 and, therefore, be an undue hardship for the company. Plaintiff then complained that defendant's refusal to accommodate her was also racial discrimination, given that it had accommodated another worker who was Caucasian, by allowing her to transfer to a new location and perform only written work. Noting that the two employees' jobs were different, defendant would not rescind its decision regarding the Cascade facility. Consequently, when plaintiff returned to work on February 13, 1996, she was again assigned to the Waters facility as a CSR III. After seven or eight days, plaintiff again became ill and went on leave. Defendant then terminated her employment. Because her symptoms have persisted since that time, plaintiff has not looked for other work. During this period, plaintiff also amended her MDCR complaint to include a race discrimination claim.

On October 25, 1996, plaintiff filed this action, claiming that: 1) the defendant would not provide reasonable accommodations for her to return to work after she was injured on the job; 2) BC/BS had given preferential treatment to a Caucasian employee in her request for accommodation; and 3) defendant wrongfully discharged plaintiff in retaliation for filing a claim with the MDCR. Defendant requests summary judgment on the grounds: 1) that plaintiff is not "otherwise qualified" within the meanings of the

ADA, and, therefore, is not covered by it; 2) that plaintiff is not "similarly situated" to the Caucasian employee to whom she has compared herself and, therefore, has no disparate treatment claim; and 3) that plaintiff's retaliation claim is entirely speculative.

## DISCUSSION

### A. ADA claim

█ Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, hiring, advancement, or discharges of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To recover on a claim of discrimination under the Act, a plaintiff must show that: 1) s/he is an individual with a disability within the meaning of the Act; 2) s/he is "otherwise qualified" to perform the job requirements; and 3) s/he either was subject to an adverse employment decision that was made *solely* because of her disability or was denied a reasonable accommodation for her disability. *Smith v. Ameritech,* 129 F.3d 857, 866 (6th Cir.1997).

Assuming *arguendo* that plaintiff is disabled within the meaning of the statute, the question remains whether plaintiff Moody was "otherwise qualified" for the positions for which she applied at the time when she was being considered. A disabled individual is deemed "otherwise qualified," so long as they can perform the essential functions of the job in question. 42 U.S.C. § 12111(8). In evaluating whether or not plaintiff can perform the essential functions of a particular position, the Court is specifically instructed to consider "the employer's judgment as to what functions are essential." 42 U.S.C. § 12111(8).

█ In the instant case, plaintiff does not claim that she was capable of performing the essential functions of her position without a reasonable accommodation; rather, her claim is based on her assertion that defendant failed to provide her with such a reasonable accommodation. Reasonable accommodations include:

(A) making *existing* facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a *vacant* position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added). . Employers do not, however, have a duty to *create* new positions for disabled employees. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir.1996). Nor do employees have the right to demand a particular accommodation. *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir.1996).

■ The accommodation plaintiff repeatedly requested from defendant was to be allowed to serve as a CSR III or PES doing only written work. Thus, the Court must determine what the essential functions of those positions are. Based on both the defendant employer's assertions and plaintiff's own statements under oath at deposition, in her affidavits, and in her brief, the "primary purpose" of both positions is to do both written *and* oral work. Based on that observation alone, the Court must find that, as a matter of law, oral review of customer inquiries is an essential function of both positions. Having established this fact, plaintiff's claim will only withstand summary judgment if she has suggested an accommodation that would enable her to perform those essential functions of her job. Plaintiff does no such thing. On the contrary, she suggests that if she were employed at the Cascade facility doing only written work, someone else could perform the telephonic and walk-in portions of the PES or CSR III position. Thus, even if she were accommodated, she would not be performing the essential functions of her position and, therefore, would not be "qualified" under the statute. Furthermore, as the plaintiff herself admits, there have been no positions for CSRs or PESs at the Cascade

facility since 1991. Consequently, in effect, plaintiff requests the creation of a new position, an accommodation not required by the ADA. Plaintiff's claim, therefore, fails as .a matter of law.

**Title VII Claim**

■ Turning to plaintiff's Title VII claim, the Court notes that the fact that plaintiff's ADA claim has failed does not, in and of itself, indicate that plaintiff's race discrimination claim should be dismissed as well. While employers may not be required to create new jobs under the ADA, once they choose to do so for one employee, they may not discriminate based on race when choosing which employee will get such special accommodations. As a result, plaintiff's race discrimination claim survives.

■ Title VII provides in pertinent part that: "It shall be an unlawful employment practice for an employer ... to limit, segregate, or classify [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. The central inquiry in a disparate treatment case is whether a similarly-situated non-minority employee received better treatment than plaintiff for the same or similar conduct.[2] *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582–83 (6th Cir.1992). "In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of [her] employment situation are "nearly identical" to those of the [Caucasian] employee[] who [s]he alleges [was] treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances." *Pierce v. Com-*

**2.** First and foremost, the proponent of a race discrimination claim must demonstrate that s/he is a member of a protected racial class. In the instant case, however, plaintiff has failed to make

such an allegation. Consequently, plaintiff's claim is technically insufficient. The Court will, nevertheless, proceed with a substantive analysis of plaintiff's claim. .

*monwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994); *see also Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992) (holding that, in order to be deemed "similarly-situated," the plaintiff must show that the comparables "are similarly-situated in all respects") (citing *Stotts v. Memphis Fire Dept.,* 858 F.2d 289 (6th Cir.1988)).

 In the instant case, plaintiff's claim is based on her assertion that a Caucasian employee, Melinda Emeott, received the accommodation which plaintiff sought but was refused. Thus, the Court must determine whether plaintiff and Ms. Emeott were similarly situated when they requested accommodations. The Court concludes that they were not. Emeott held a different position from Moody: Emeott was a CSR IV, doing only written reviews at the Glenwood facility before her transfer to Saginaw, while Moody had either worked as CSR III or a PES at the Glenwood or Waters facilities, both of which required either telephone or walk-in contact. Because her higher level position did not involve handling oral inquiries, Emeott's request for accommodation only required that BC/BS mail her work to a different postal stop. Moody's request required that BC/BS create a new position for her, a CSR III doing only written work at the Cascade facility. Given that the relevant aspects of Emeott's and Moody's respective employment situations were dissimilar, the Court finds that the comparables here were not similarly situated and plaintiff's claim of racial discrimination, therefore, fails as well.

**MELCRA Claim**

 Claims filed under MELCRA demand the same analysis as those filed under Title VII. *Pitts v. Michael Miller Car Rental,* 942 F.2d 1067, 1070 (6th Cir.1991). Consequently, for the reasons stated above, the Court grants defendant's motion on this claim as well.

**Retaliation Claim**

 Plaintiff also claims that defendant retaliated against her for filing a complaint with the MDCR, thereby violating both the ADA and Title VII. To establish a prima facie case of retaliation under either statute, plaintiff must show that: 1) she engaged in protected activity, 2) defendant took adverse action against her, and 3) there is a causal connection between the protected activity and the adverse employment action. *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir.1997).

 There is no dispute that filing a discrimination charge with the MDCR is a protected activity and that defendant did take adverse action against her by terminating her after the charge was filed. Plaintiff has not, however, presented sufficient evidence to raise a genuine issue of material fact as to the causation requirement of the prima facie case. Plaintiff's claims of retaliation are entirely speculative, particularly in light of the fact that: 1) defendant did rehire her on two occasions after she filed the claim; and 2) defendant's decision to terminate her was justified in light of plaintiff's unreasonable accommodation request and her inability to perform the essential functions of her job. Thus, having found that plaintiff has not presented evidence of a nexus between the adverse employment decision made against the plaintiff and her filing of the MDCR complaint, the Court finds that plaintiff has not presented a prima facie case for retaliation and the claim will be dismissed.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is **GRANTED**.