**Donna HENDRICKS–ROBINSON, Penny Moore, Teresa Westlake, et al., Plaintiffs–Appellants,**

v.

**EXCEL CORPORATION, Defendant–Appellee.**

No. 97–3217.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1998.

Decided Aug. 28, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 24, 1998.

Michael B. Erp, Laurie M. Burgess (argued), Katz, Friedman, Schur & Eagle, Chicago, IL, for Donna Hendricks–Robinson, Penny Moore, Teresa D. Westlake.

Michael B. Erp, Katz, Friedman, Schur & Eagle, Chicago, IL, John P. Nicoara, Nicoara & Steagall, Peoria, IL, for Cynthia Peters.

Joseph E. Tilson (argued), Timothy A. Wolfe, Bates, Meckler, Bulger & Tilson, Chicago, IL, for Defendant–Appellee.

Before FLAUM, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiffs in this case represent a class of individuals who sustained permanent injuries while working on the production line of a meatpacking plant owned by the Excel Corporation ("Excel"). These permanently restricted employees sought to continue working for Excel in their original jobs or in some other capacity but were placed on medical layoff and eventually were terminated. They filed their complaint as a class action, alleging that Excel's unfair employment practice of laying off and terminating its employees because of their disabilities violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213. The district court granted Excel's motion for summary judg-

ment; the plaintiffs timely appealed. For the reasons that follow, we reverse the judgment of the district court and remand the case for proceedings consistent with this opinion.

# I

# BACKGROUND

## A. Facts [1]

Excel's meatpacking plant in Beardstown, Illinois, slaughters, cuts and packages approximately 15,000 hogs daily. The plant operates two shifts and employs between 1,600 and 1,800 employees, 85% of whom are on production lines slaughtering hogs.[2] Those on the production lines work hard, usually under uncomfortable conditions; their tasks are often heavy and include much repetitive handwork that must be performed quickly and precisely. The rate of injury among such workers is, not unexpectedly, high.

The plaintiffs in this case and the class they represent are former production workers at Excel who were injured on the job and placed on medical layoff after they received permanent medical restrictions that precluded them from performing their regular jobs and any other available production jobs at the plant. The district court certified the plaintiff class on the ground that it was attacking Excel's medical layoff policy and was not pursuing the plaintiffs' individualized claims. The central issue in this case is whether Excel's medical layoff policy violates the ADA because it fails to provide reasonable accommodation to its permanently restricted employees.[3] There is no written policy statement in the record;[4] we therefore shall begin with Excel's description of its policy and then shall consider the plaintiffs' contrasting description of the policy as, in their view, it has been put into practice at the Beardstown plant.

## 1. Excel's Medical Layoff Policy

In order to reduce the rate of injury and to lessen the impact of injury on its workers, Excel began, in 1989, an Ergonomics and Medical Management Program that provides ergonomics training and catalogs the physical requirements of each production job at the plant. Its experts in ergonomics and occupational medicine designed Medical Management Job Analysis ("MMJA") forms by which the physical and environmental demands of each job could be measured and closely com-

1. The district court set forth a thorough rendition of the factual background in this case. *See Hendricks–Robinson v. Excel Corp.*, 972 F.Supp. 464 (C.D.Ill.1997). Consequently, we shall recite only those facts necessary for resolution of the issues on appeal.

2. The production workers are represented by the United Food and Commercial Workers Union, Local 431 ("the Union"). A collective bargaining agreement ("CBA") between Excel and the Union governs the production workers' terms and conditions of employment.

3. We note that the parties accept without argument that the plaintiffs are "otherwise qualified disabled employees" who either are disabled or are perceived by Excel to be disabled. Because this is a class action focusing on the employer's policy rather than the employees' qualifications under the ADA, the parties refer to the class of workers as "permanently restricted employees." We shall do the same.

4. The record does contain an agreement forged in 1989 between Excel and the Union that initiated an ergonomics program. Under the agreement, procedures to facilitate workplace safety and health were implemented: Ergonomic monitors were trained to identify ergonomic stress in work areas and to recommend solutions and a medical program was established for prompt evaluation of employee ergonomic stress symptoms (focusing on muscle/tendon injuries and particularly on early symptoms of carpel tunnel disorder). The agreement established that medical personnel would be given ergonomic analyses of all regular light and alternate duty jobs so that a worker with early symptoms of carpel tunnel disorder ("CTD") could be assigned a suitable job. Moreover, if an employee with potential CTD returned to work, he was assigned a job within the doctor's restrictions. These statements constitute the entirety of Excel's Ergonomics Program concerning medical treatment. Because nothing in the program set up in that agreement takes into consideration those employees whose restrictions are permanent and are placed on medical layoff, this class of plaintiffs was required to show that Excel's policy as it is *implemented* at the Beardstown plant violates the ADA. We note that the plaintiffs have not focused on the facts surrounding their individual claims except insofar as those facts challenge Excel's policy and are illustrative of the violations the plaintiff class alleges.

pared with an injured employee's medical restrictions. Excel uses these forms for "job-matching": matching injured employees with the available jobs that are consistent with their medical restrictions.

On the "medical management" side of Excel's program, an injured employee is referred first to the plant's nursing staff for evaluation, even though he may be receiving treatment from his own physician. If an employee is able to resume work but has temporary medical restrictions, a plant nurse compares the restrictions to the essential functions of the employee's job and determines whether the employee may safely perform that job within those restrictions. The nurse consults the employee himself, the MMJA form for that job, and others familiar with the job (like the production supervisors and the plant's safety director, ergonomics coordinator and ergonomics monitor).

If an employee cannot perform his regular job, it is the company's policy for the plant nurse to try to find an interim "light-duty" job or to create a "make-work" assignment that the temporarily restricted employee can perform safely until he is able to return to his former job.[5] Excel and the Union have set aside certain jobs from the normal job bidding process for this purpose; a number of the least physically demanding jobs are reserved for rehabilitating employees. It is Excel's policy to confine light-duty jobs and assignments to employees whose medical restrictions remain temporary; once an injured employee's medical restrictions become permanent, however, the employee must either obtain a regular position he can perform or go on "medical layoff."

According to Excel, an employee's restrictions are treated as "permanent" when his physician has determined that he has achieved his maximum medical improvement and will recover no further. Excel explains that its policy of keeping light-duty assignments as temporary avoids having the finite pool of light-duty assignments taken permanently by persons whose conditions were not improving. A temporarily restricted employ-

ee may perform light-duty work for indefinite and varying lengths of time, but when his medical restrictions are determined to be permanent because his medical condition is not expected to improve further, he becomes ineligible for light-duty work.

Once the "permanent medical restriction" determination is made, an Excel nurse re-evaluates the employee's abilities to see whether his restrictions permit him to perform the essential functions of his regular job or of other available production jobs, with or without reasonable accommodation. As before, the nurse compares the employee's permanent restrictions with a job's essential duties, using the MMJA form, consulting with the employee and others in the plant familiar with the job, and observing the job in question. If his permanent medical restrictions preclude him from performing his regular job and any other available job, the employee may examine the plant's job postings and bid book to find either production or nonproduction jobs that he feels he can perform. Then the nurse meets with the employee to confirm the fact that there are no jobs he can perform. The ergonomics monitor compares the employee's restrictions with the MMJA form description of his regular job to confirm whether the employee could perform the job with accommodation. The plant's safety director, in the presence of the Union representatives and the plant's ergonomics coordinator, then explains to the employee that his restrictions preclude him from performing his regular job. If no accommodation or other available jobs can be found, the permanently restricted employee is placed on medical layoff.

Under its policy, Excel then offers the employee a complete tour of the plant to familiarize the employee with other production jobs he may believe he can perform. Although the tour shows the employee only the other production jobs, the employee is free to inquire about and apply for any non-production jobs, such as office clerical positions. He is also free to suggest accommodations that might enable him to perform his

---

**5.** According to Excel, its policy also includes investigating any potential accommodation envisioned by the employee, the nurse or anyone else

that would allow the employee to continue working his regular pre-injury job.

job or another available job. Excel claims that, since 1991, its policy has enabled at least 45 employees with permanent medical restrictions to continue working in the plant without being placed on medical layoff.

Once a permanently restricted employee is placed on medical layoff, Excel automatically bids the employee for all vacant production jobs that become available during the next 12 months.[6] While on layoff, that employee may call the plant on a weekly basis to ask about jobs and may bid on any vacant job, whether it be production or nonproduction. If the employee is the most senior applicant, he "wins" an automatic bid while on medical layoff. At that point, the nurse again compares the employee's medical restrictions with information about the available job. If the employee is able to perform the essential functions of the position, with or without accommodation, he is awarded the position and taken off medical layoff status. According to Excel, since 1991, at least 6 medically laid-off employees have been offered different production jobs through this process. However, if an employee remains on medical layoff for 12 months, he is terminated.

## 2. Plaintiffs' View of Excel's Policy

The plaintiffs, former Excel employees who were placed on medical layoff and then terminated 12 months later, take issue with Excel's description of its medical layoff policy and practice. Focusing on the time when an injured employee's recuperation period is over, they assert that, once a doctor (typically the company's doctor, they claim, rather than a personal physician) determines that an employee's restrictions are permanent, that employee is put on medical layoff and eventually, inevitably, terminated—even though he was successfully performing a regular, necessary job at the plant. The plaintiffs claim that it is the responsibility of a company nurse to assess whether a permanently restricted employee can work in his previous job or in any open job in the plant—and that assessment is limited to production

jobs. If the nurse concludes that there is no job available, the employee is taken off the light-duty job he is doing successfully. He meets with the nurse, who reviews the restrictions which precluded him from production work in the plant. According to the plaintiffs, job accommodation is not discussed with the employee. An Excel management representative tells the employee that he cannot remain in that job and that he is being placed on medical layoff. At no point during these meetings, claim the plaintiffs, does anyone from management discuss the possibility of individualized job accommodations, flextime, job restructuring or job sharing. Many of the class members asked to remain working in the plant in any available position; however, none of these requests resulted in job reassignment, even though such jobs were available in the plant.

The plaintiffs also point out that it was Excel's admitted policy to exclude the non-production positions from the plant tour. They contend that Excel tells the employees on medical layoff that the company will automatically bid them on any and every job in the plant; thus assured, they believe that they do not have to place their names on a list to be considered for a nonproduction job opening. They are told to call the human resources office each week; failure to call in a given week, they are warned, will be considered a "voluntarily quit" which results in the loss of their rights to reinstatement and other benefits. As the plaintiffs point out, however, job openings are posted exclusively inside the plant, where employees on medical layoff are denied access, and are posted for only two days. Therefore it is virtually impossible for them to bid on such jobs, they claim.

If the employee on medical layoff is the most senior of any employee to bid on a particular job, the bid is sent to the nursing department where a comparison is made between the employee's medical restrictions and the MMJA form describing the job in

---

**6.** An employee who is off work for any reason for 12 consecutive months forfeits his seniority and therefore, under the terms of the collective bargaining agreement, is no longer an employee of the plant. *See* CBA, Art. XIII, § 7E. The CBA

was renegotiated in 1995 and the maximum period was increased to 18 consecutive months. Because this litigation was filed in 1994, we will refer, in general, to the terms of the earlier CBA.

question. The nurse determines whether the employee is eligible for the job by comparing with the other candidates that employee's seniority, his ability to perform the work and his "physical fitness," as required in Article XIII, § 1(B) of the collective bargaining agreement with the Union. According to the plaintiffs, however, this process is conducted without the employee's knowledge. Excel does not inform an employee that he is the most senior bidder on an open job and never calls in an employee to discuss possible accommodations. The decision that an employee is or is not qualified is made exclusively and unilaterally by Excel.

When the plaintiffs called in to check on open positions, they were told that there were no jobs available. Moreover, throughout the medical layoff period until they were terminated 12 months later, they were never considered for nonproduction jobs at Excel. Once they were terminated, at the end of the 12–month period, they were not eligible for any position with Excel pursuant to its policy of refusing to rehire any former employees, regardless of the reason for their termination.

## B. Decision of the District Court

The district court examined each of the plaintiffs' allegations that Excel's medical layoff policy and procedures violated the ADA. *See Hendricks–Robinson v. Excel Corp.*, 972 F.Supp. 464 (C.D.Ill.1997). The plaintiffs first contended that Excel violated the ADA by removing medically restricted employees from light-duty positions once it was determined that they were permanently restricted. The district court found persuasive the explanation in the Compliance Manual issued by the Equal Employment Opportunity Commission ("EEOC"), which stated that an employer may determine that a light-duty position will be temporary rather than permanent in nature and may provide the position only on a temporary basis without violating the ADA. *See id.* at 469 (citing *EEOC Enforcement Guidance: Workers Compensation and the ADA,* EEOC Compliance Manual § 915.002 at p. 23 (Sept. 3, 1996)). The court also noted that the jobs were temporary in nature—the plaintiffs

were given the light-duty jobs during their recovery periods and were removed from the positions only after it was determined that they were permanently restricted. The court concluded that all of Excel's light-duty jobs were considered temporary and thus that Excel "was not required to make those positions permanent as a reasonable accommodation under the ADA." *Id.* at 470.

The district court then considered the plaintiffs' allegation that Excel violated the ADA by restricting the positions used for accommodating disabled employees to production jobs only. Reviewing the record, the court found that Excel's policy was to bid permanently restricted employees automatically for vacant *production* positions; however, the company considered all employees' applications for *nonproduction* positions as well. "To penalize Excel for not automatically bidding permanently restricted employees on all nonproduction jobs," the court held, "not only violates the spirit of the ADA but discourages employers from assisting disabled employees beyond the requirements of the ADA." *Id.* at 473.

The court turned next to the plaintiffs' argument that Excel's job matching process violated the ADA. In particular, the plaintiffs alleged that Excel failed to engage in an interactive process with its employees to discover what reasonable accommodations would enable them to remain employed. The court rejected this allegation. It noted that the ADA requires an interactive process in which both parties bear the responsibility for determining what accommodation is necessary. The court then determined that the plaintiffs were responsible for the breakdown in the interactive process in this case. According to the court, Excel made itself available to the employees for informal discussions, plant tours, meetings with nurses and ergonomic monitors, and provided an automatic bidding process for those employees on vacant production positions. The permanently restricted employees also could call the plant to discuss the availability of vacant nonproduction positions and of reasonable accommodations. Therefore, the court concluded, Excel appropriately engaged in an interactive process to determine the feasibility of reasonable accommodations, as the

ADA required. It also pointed out that, until a permanently restricted employee applies for and is refused a vacant position because of his disability, a suit complaining about the refusal to give that applicant a position is premature.

The court addressed the plaintiffs' final argument, that the "physical fitness" requirement in the seniority provision of the CBA violated the ADA. The seniority provision, Article XIII, § 1(B) of the CBA, provides:

Layoff, recall and promotion will be based on length of service within a department or the plant, provided the qualifications, ability to perform the work and physical fitness are equal among employees eligible for consideration.

The court examined the plaintiffs' claim that the "physical fitness" requirement in that provision violated the ADA because (1) it was a screening device to discriminate against the disabled in favor of the more physically fit, and (2) it precluded an individualized assessment as required by the ADA. The court determined that the physical fitness requirement refers to the employee's physical fitness to perform the essential functions of the vacant position. Such a requirement for job-related physical fitness is a valid evaluation factor in an ADA claim, the court found. The court was of the view that Excel's production jobs, which involve strenuous manual labor, require consideration of an employee's physical fitness as a job-related factor along with the applicant's seniority. Finally, the court believed that the physical fitness requirement was not a blanket policy provision but rather a part of an individualized assessment of the applicant's needs, physical capabilities to perform the essential functions of the position, and any available reasonable accommodation. Accordingly, it held that the physical fitness requirement did not violate the ADA. The court granted summary judgment to Excel and denied summary judgment to the plaintiffs.

## II

## DISCUSSION

### A. Appellate Review of Summary Judgment

■ We conduct de novo review of a district court's decision involving cross-mo-

tions for summary judgment. *Bagdonas v. Department of Treasury*, 93 F.3d 422, 425 (7th Cir.1996); *Barefield v. Village of Winnetka*, 81 F.3d 704, 708 (7th Cir.1996). Summary judgment is proper only when the record demonstrates "that there is no genuine issue as to any material fact and that [a] moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made. *See Andersen v. Chrysler Corp.*, 99 F.3d 846, 855 (7th Cir. 1996); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir.1996); *see also Garratt v. Walker*, 121 F.3d 565, 567 (10th Cir.1997). Thus, we examine the record in the light most favorable to the plaintiffs, granting them the benefit of all reasonable inferences that may be drawn from the evidence and reversing if we find a genuine issue concerning any fact that might affect the outcome of the case. *See Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1132 (7th Cir.1994).

### B. Violation of the ADA

■ The central issue in this appeal is whether Excel's medical layoff policy, as it was implemented, violated the ADA. The statute forbids a covered employer from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The question of whether plaintiffs are qualified individuals with a disability is not before us. *See* n.3 *supra*; *Hendricks–Robinson v. Excel*, 972 F.Supp. at 468. The issue is whether Excel's policy discriminated against the plaintiffs by failing to make reasonable accommodations for them as disabled individuals. We begin with the particular statutory provision that defines the term "discrimination." The term includes:

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 12112(b)(5)(A), (B). Under the ADA, an employee begins the accommodation "process" by informing his employer of his disability; at that point, an employer's "liability is triggered for failure to provide accommodations." *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir.1996). "Once an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process'' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996). The "reasonable accommodation" element of the Act imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodations which might enable the employee to continue working. *See* 29 C.F.R. § 1630.2(*o*)(3); *see also* 29 C.F.R. Pt. 1630, App. § 1630.9. If the employee is unable to perform his job, with or without accommodation, the employer must consider reassignment as one form of accommodation. *See* 42 U.S.C. § 12111(9)(B).[7] An employer must make a reasonable effort to explore the accommodation possibilities with the employee. *See Miller v. Illinois Dep't of Corrections*, 107 F.3d 483, 486–87 (7th Cir.1997). If a vacant position is available and the disabled employee is qualified for it, "the ADA may require an employer to reassign [him] ... as reasonable accommodation." *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir. 1996).

Having set forth the basic ADA requirements concerning reasonable accommodation, we shall now consider the specific contentions of the plaintiffs.

### C. Excel's Medical Layoff Policy and its Implementation

The plaintiffs have no complaint about the way Excel treated them during their recuperation period, when they were given light-duty jobs. Our scrutiny of Excel's policies and procedures begins, therefore, at the point that an employee's injuries are determined medically to be permanent restric-

---

**7.** The Equal Employment Opportunity Commission ("EEOC"), the agency charged with implementing the ADA, explains an employer's duty of reassignment in its Enforcement Guidance:

> Where an employee can no longer perform the essential functions of his/her original position, with or without reasonable accommodation, because of a disability-related occupational injury, an employer must reassign him/her to an equivalent position for which s/he is qualified, absent undue hardship. If no equivalent position (in terms of pay, status, etc.) exists, then the employee must be reassigned to a lower graded position for which s/he is qualified, absent undue hardship.

EEOC Enforcement Guidance: "Workers' Compensation and the ADA," ADA Manual No. 57 at 70:1220 para. 22(BNA). The interpretation of the ADA by the enforcing agency is entitled to deference. *See EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 115, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 143 n. 4 (3d Cir.1998); *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 150 n. 3 (2d Cir.1998); *Olson v. Dubuque Community Sch. Dist.*, 137 F.3d 609, 612 (8th Cir.1998); *cf. Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 155 (7th Cir.1994) (EEOC interpretation of ADEA given deference), *cert. denied*, 513 U.S. 948, 115 S.Ct. 359, 130 L.Ed.2d 313 (1994); *Hale v. Marsh*, 808 F.2d 616, 620 (7th Cir.1986) (EEOC view of Title VII claim given weight). The EEOC's guidelines, " 'while not controlling upon courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Smith v. Midland Brake, Inc.*, 138 F.3d 1304, 1308 n. 2 (10th Cir.1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

tions. At that stage, Excel considers whether that employee can resume his old pre-injury job, with or without accommodation, or can be reassigned to another position, with or without accommodation, or must be placed on medical layoff. The plaintiffs claim that Excel violates the ADA at that stage by failing to engage in an interactive process of identifying the employee's precise limitations and by failing to make a good faith effort to identify appropriate accommodations. The plaintiffs focus on various steps in Excel's medical layoff process to support their claim that Excel violated the ADA. We shall examine seriatim each challenge they raise.

### 1. Nonproduction Jobs

■■■ The plaintiffs point out that an employer is required to consider all reasonable job assignments when accommodating a disabled employee; when an employee asks for work, the employer must attempt to reassign him to any available vacant job for which he is qualified. The plaintiffs assert that they had asked for continued employment anywhere in the plant, either in the jobs they had or in any other one, even at a lower salary. They claim that, by making such a request, they showed the requisite interest to trigger Excel's duty to suggest reassignment accommodations to any available job. However, Excel's policy, they explain, was that disabled employees were considered for reassignment only to production, not nonproduction, jobs. Therefore the 240–270 nonproduction jobs that accommodated the class members' disabilities were not available to them. According to the plaintiffs, this policy of excluding all nonproduction jobs from consideration violates the ADA.

Excel responds that it did not exclude nonproduction jobs from reassignment consideration. Although it automatically bid the disabled employees only for production positions, Excel insists it would consider any employee for any nonproduction job for which he applied. Excel suggests that the employee also has responsibility for identifying a reasonable accommodation. The company claims that it made extraordinary efforts toward accommodating injured employees and should not be penalized by making it carry those efforts even further.

■■■ As we noted above, the ADA's definition of "reasonable accommodation" includes reassignment to a vacant position for which the employee is qualified. 42 U.S.C. § 12111(9)(B). A request as straightforward as asking for continued employment is a sufficient request for accommodation. See Miller, 107 F.3d at 486–87 ("Even if an employee who as here becomes disabled while employed just says to the employer, 'I want to keep working for you—do you have any suggestions?' the employer has a duty under the Act to ascertain whether he has some job that the employee might be able to fill."). We recently concluded that section 12111(9)(B) "has the effect of making the duty to transfer to another position roughly commensurate with the full class or range of jobs the employee is capable of performing." DePaoli v. Abbott Labs., 140 F.3d 668, 675 (7th Cir.1998). We held that "the ADA affirmatively compels consideration of job reassignment to a vacant position," but also allows an employer to consider legitimate nondiscriminatory prerequisites to jobs, such as the requirement of prior experience or the limitation of a position to temporary use only. Id. In Dalton v. Subaru–Isuzu Automotive, Inc., 141 F.3d 667 (7th Cir.1998), we reiterated the point:

In our view, in order to be considered "qualified" for the potential new position, the individual must again (1) satisfy the legitimate prerequisites for that alternative position, and (2) be able to perform the essential functions of that position with or without reasonable accommodation.

Id. at 678. We also clarified an employer's duty to his employee to accommodate by means of reassignment. First, an employer is required to "identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites." Id. Next, he must "determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations." Id. We underscored that an "employer's duty to

accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion." *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(ii)(C) (defining "broad range of jobs in various classes"); 29 C.F.R. Pt. 1630, App. § 1630.2(*o*)). We also explained how an employer should accomplish the job-matching required:

> The critical factor is the match between the employee's knowledge, skills, and abilities, and the legitimate requirements for other positions with the employer; it is not whether those other positions look exactly like the job the employee's disability prevents him or her from performing. This interpretation is consistent with the language from the House Report on the bill that became the ADA, to which we referred in *Gile*, 95 F.3d at 498:
>
> > If an employee, because of his disability, can no longer perform the essential functions of the job that he or she has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and the employer from losing a valuable worker.
>
> H.R.Rep. No. 485(II), 101st Cong., 2d Sess. (1990), U.S.Code Cong. & Admin. News 1990, 267. It is also consistent with the overall structure of the ADA to look to the class of jobs or broad range of jobs that the employer might give to a person with the plaintiff's qualifications. Cf. 29 C.F.R. § 1630.2(j)(3)(ii)(B) (defining "class of jobs").

*Id.* at 678–79 (quoting *Gile v. United Airlines*, 95 F.3d 492, 498 (7th Cir.1996)).

■ It is clear from our case law, therefore, that Excel has the duty to consider reassigning its disabled employees to other jobs for which they are qualified. *See Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633–34 (7th Cir.1998) (noting that employee requested to be assigned to any open position and that there was a genuine issue whether there were open positions available that he could perform). Excel is required to identify "the *full range* of alternative positions" available and "to consider transferring the employee to *any* of these other jobs, including

those that would represent a demotion." *Dalton*, 141 F.3d at 678 (emphasis added). Of course, "[n]othing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers." *Id.* On this record, we do not believe it can be said, as a matter of law, that Excel's policy fulfills those requisites. Its policy fails, in fact refuses, to consider reassigning its permanently restricted employees to nonproduction jobs unless the employee independently learns about the vacancy and applies for the job. Yet, on this record, it appears questionable whether Excel affords these employees an adequate opportunity to learn of the nonproduction jobs and to express an interest in them. Excel's disclaimers—that it did not prohibit disabled employees from applying for these jobs, that it would have shown a disabled employee a nonproduction job if he had asked, that nonproduction jobs were posted, and that it of course would consider any employee's application for a nonproduction job—are insufficient to support summary judgment in light of at least two hurdles Excel placed in front of the employees on medical layoff. First, the record evidence indicates that Excel had told the laid-off employees that their names would be bid automatically for *all* available positions in the plant. Second, job openings were posted inside the plant and were left posted for a period of only two days; the employees on medical layoff were not given access to the plant during their layoff period and, instead, were told to call the plant once a week—at which time they were told that there were no openings. Excel disputes some of that evidence. In our view, there are genuine issues of material fact concerning (1) the extent to which Excel may have misled its disabled employees, when it placed them on medical layoff, by representing that it would automatically bid them for every job in the plant, and (2) the extent to which laid-off employees had access to posted jobs and other job listings. Resolution of either of these issues in favor of the employees might justify the jury's concluding that the laid-off employees may have been denied the chance to consider all available job opportunities. We hold, there-

fore, that the district court erred in concluding, on this record, that Excel had gone "above and beyond what the ADA required" because the company gave plant tours and automatically bid the permanently restricted employees for production jobs. *See* 972 F.Supp. at 473. Accordingly, we remand this case for further consideration of the automatic bidding procedure and the ability of laid-off disabled employees to access the information about job vacancies.

## 2. Light–Duty Work

■ It is Excel's policy, explain the plaintiffs, initially to place injured workers in other jobs—other production jobs, nonproduction jobs or light-duty jobs—that they can perform while they are recuperating from their injuries. However, when Excel determines that an injured employee's medical restrictions are permanent, the company removes him from his "recuperation period" job and places him on medical layoff. The plaintiffs contend that the district court erred in concluding that all such jobs were "temporary" and therefore did not need to be considered when reasonably accommodating the disabled employees. According to the plaintiffs, the record evidence indicates that Excel removed permanently restricted employees from regular, permanent production and nonproduction jobs solely because Excel had determined that the employees were disabled and could not perform their pre-injury production jobs. In this regard, the plaintiffs charge that the company violated the ADA in two ways: First, it took regular, permanent jobs in the plant, relabeled them as "light-duty" (and, implicitly, as "temporary") and then excluded permanently handicapped employees from those jobs. Second, Excel removed qualified workers from regular, permanent plant jobs which they were performing successfully solely because they were not capable of doing their pre-injury jobs. The plaintiffs contend that the relevant inquiry is not whether a disabled employee was qualified for the job he held prior to the injury but rather whether he is qualified to do the job he currently holds.

Excel responds that the ADA does not require an employer to establish light-duty assignments and certainly does not compel an employer to make such assignments permanent. Excel contends that it cannot be deemed to have violated the ADA by reserving light-duty positions for the specific purpose of accommodating the employees' temporary medical restrictions and then by discontinuing those assignments after the class members' medical restrictions changed. The company urges us to uphold the district court's conclusion that Excel's two-pronged policy of setting aside certain jobs for injured employees, to help them in their transition back into mainstream jobs, and then of removing the employees from those temporary light-duty positions once they were determined to be permanently restricted did not violate the ADA.

Our case law and the EEOC's interpretation of the ADA have approved of an employer's offer of light-duty assignments as a reasonable accommodation for injured workers. *See, e.g., Dalton,* 141 F.3d at 680; *EEOC Enforcement Guidance: Workers' Compensation and the ADA,* 8 FEP Manual (BNA) at 405:7401 (1996) ("An employer may recognize a special obligation arising out of the employment relationship to create a light duty position for an employee when s/he has been injured while performing work for the employer and, as a consequence, is unable to perform his/her regular job duties."). The EEOC's Technical Assistance Manual provides specific guidance on light-duty jobs:

> [I]f an employer already has a vacant light duty position for which an injured worker is qualified, it might be a reasonable accommodation to reassign the worker to that position. If the position was created as a temporary job, a reassignment to that position need only be for a temporary period.

> When an employer places an injured worker in a temporary "light duty" position, that worker is "otherwise qualified" for that position for the term of that position; a worker's qualifications must be gauged in relation to the position occupied, not in relation to the job held prior to the injury. It may be necessary to provide additional reasonable accommodation to enable an injured worker in a light duty

position to perform the essential functions of that position.

*EEOC: Technical Assistance on Title I of ADA*, 8 FEP Manual (BNA) § 9.4 at 405:7057–58 (1992). In *Dalton*, we reviewed a light-duty program set up for employees recuperating from recent injuries whose disabilities were temporary. The employees could have the light-duty jobs for 90 days only; the positions then were available for other injured workers. *Dalton* considered an allegation much like the one before us today: the complaint of those employees who had been removed from light-duty jobs, when they were well qualified to continue performing their temporary jobs, in order to allow other injured workers to fill the jobs. In *Dalton*, we found that the temporary and limited nature of the light-duty program did not violate the ADA.

> The ADA does not compel an employer to reduce the number of bona fide temporary jobs it has set aside ... and to convert them to permanent positions for its disabled employees. The ADA does require that [the employer] make its light-duty program available to disabled employees who are recuperating from temporary restrictions and are otherwise qualified to participate. *See* C.F.R. Pt. 1630, App. § 1630.9. But nothing here indicates that [the employer] failed to do that, and it was entitled to reserve a reasonable number of positions for this special purpose. To hold otherwise would be to require [the employer] to create new full-time positions to accommodate its disabled employees, a course of action not required under the ADA.

*Id.* at 680; *see also EEOC Enforcement Guidance*, 8 FEP Manual (BNA) at 405:7402 ("An employer is free to determine that a light duty position will be temporary rather than permanent."). As we suggested in *Dalton*, we believe that it would frustrate the ADA for permanently impaired employees to fill temporary light-duty assignments when those jobs have been set aside specifically for recuperating employees. In the case before us, employees were given light-duty positions with no end-date, no specified period for holding the job; they remained in those jobs until a medical decision concerning the permanence of their disabilities was rendered. Although we believe that the temporary nature of a light-duty program should not be adjudged by the absoluteness of the time period in which an injured employee may participate, we note that Excel specifically created light-duty positions in the CBA but did not designate those jobs as "temporary." [8] Excel's light-duty jobs were placed outside the normal bidding procedures; but it remains a question of fact whether the jobs were temporary. If the light-duty positions truly are temporary, Excel was not required to convert them into permanent ones for the permanently restricted employees. *See Dalton*, 141 F.3d at 680. However, if the job in which an injured employee was placed is in fact a vacant permanent job, production or nonproduction, and it is suitable for an employee with a disability, then the employee's assignment to that position must be treated as a reassignment to a permanent job for purposes of accommodation. *See EEOC Enforcement Guidance*, 8 FEP Manual at 405:7402 ("In some cases, the only effective reasonable accommodation available for an individual with a disability may be similar or equivalent to a light-duty position. The employer would have to provide that reasonable accommodation unless the employer can demonstrate that doing so would impose an undue hardship.").

---

**8.** In the 1991–94 CBA, the following jobs were set aside as light-duty work: stamp hogs, feed headsplitter, pick brains, pick pituitaries, taking temperature of pet food, skin snouts in rotary skinning machine, save skins for cracklings, separate trim from old ham line, remove lean from fat belt, frock room, wash gloves, clean canteen tables, putting CVP labels, wash out mouths, watch auto knife, stomach washer/boxing pepsin, save trim from pack line, spotting bellies, boxing fatbacks, make boxes, box conveyor.

In the 1995–99 CBA, the list was reduced and changed a bit. It included the following light-duty jobs: skin snouts in rotary skinning machine, save skins for cracklings, separate trim from old ham line, remove lean from fat belt, putting on CVP labels, wash out mouths, watch auto knife, stomach washer/boxing pepsin, save trim from pack line, boxing fatbacks, make boxes, box conveyor, save thyroid gland, trim uteri, ink loins.

The plaintiffs claim that some of them were working such regular production jobs as trim thyroids, turn hogs, trim butts, tend skinner, front foot cutoff, ham boning and combo make-up. Others were given nonproduction work such as jobs in the purchasing department or the nurses' station. Presented with this evidence, we are persuaded that there is a genuine issue of triable fact as to whether Excel properly implemented its light-duty policy. An employer can take the least strenuous of its jobs, put them in a pool for temporary light-duty work, and use them so its employees can get back on their feet. We believe, however, that the evidence of record was insufficient to determine the extent to which Excel may have assigned injured employees to less strenuous work that was not formally classified temporary light-duty work. There is also a genuine issue as to whether the injured employees knew that the jobs in which they initially were placed were truly temporary or whether they could consider the jobs a reasonable accommodation for their impairments.

### 3. Excel's "Physical Fitness" Job Qualification

The collective bargaining agreement between Excel and the Union contains the following provision:

> Layoff, recall and promotion will be based on length of service within a department or the plant, provided the qualifications, ability to perform the work *and physical fitness* are equal among employees eligible for consideration.

CBA, Art. XIII, § 1(B) (emphasis added).

The plaintiffs assert that policies concerning employment decisions that tend to screen out disabled persons violate the ADA unless the selection criteria are shown to be job-related.

According to the plaintiffs, physical ability is legitimately part of the "qualifications" and "ability to perform" requirements of the provision but is not an additional criterion. Because Excel's policy requires physical "fitness," it rejects an individualized assessment of a disabled employee's ability to perform a job and screens out those with a disability. Such a policy constitutes a "per se" violation of the ADA because it requires a disabled person to show that, in addition to being qualified and able to perform a given job, he or she is also at least as "physically fit" as all the other applicants.

Excel responds that there is nothing in the record to show that any employee ever was laid off, denied recall or denied a promotion in deference to another employee based on the relative degree to which employees were deemed to possess "physical fitness." Without such evidence, Excel claims, the district court could not have found that the words in the labor contract signified a policy which violated the ADA. Moreover, it asserts, the clause requires an individualized assessment of a candidate's "ability to perform," and that assessment must include his physical capabilities. Because there is no evidence that the "physical fitness" factor was used to disqualify disabled employees, Excel contends that reversal of the judgment is not warranted.

The ADA regulations expressly forbid an employer

> to use qualification standards, employment tests or other selection criteria that screen out or tend to screen out ... a class of individuals with disabilities, on the basis of disability, unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

29 C.F.R. § 1630.10. "The purpose of this provision is to ensure that individuals with disabilities are not excluded from job opportunities unless they are actually unable to do the job." 29 C.F.R. Pt. 1630, App. § 1630.10. Section 1(B) of Article XIII of the CBA states that seniority is the basis for deciding layoff, recall and promotion rights—"provided that" three selection criteria "are equal among employees eligible for consideration." The three are qualifications, ability to perform the work, and physical fitness. We do not question that employees eligible for consideration in layoffs, recalls and promotions must have the proper qualifications and the ability to perform the work. Those selection criteria are job-related to any position. However, the third criterion, physical fitness,

is job-related only to the extent of the employee's ability to perform the work. *See* 29 C.F.R. Pt. 1630, App. § 1630.10 ("The purpose ... is to ensure that there is a fit between job criteria and an applicant's (or employee's) actual ability to do the job."). In our view, the separate criterion of "physical fitness"—unrelated to job requirements—as a qualification standard for promotions, layoffs and recalls tends to screen out, whether intentionally or unintentionally, disabled employees. We do not believe it should be a separate general qualification standard for all of the varied jobs at Excel. Those positions that require physical fitness necessarily incorporate the criterion in their "performance ability" criterion. Even when "physical fitness" is a selection criterion that is related to an essential function of the job, however, it "may not be used to exclude an individual with a disability *if that individual could satisfy the criteri[on] with the provision of a reasonable accommodation.*" 29 C.F.R. Pt. 1630, App. § 1630.10 (emphasis added). To the extent "physical fitness" is a separate criterion, therefore, it has the capacity to screen out disabled employees and therefore the possibility of violating the ADA's requirement of an individualized assessment of an employee's capabilities. *See* 29 C.F.R. § 1630.7 ("It is unlawful for a covered entity to use standards, criteria, or methods of administration, which are not job-related and consistent with business necessity, and: (a) That have the effect of discriminating on the basis of disability"); *Weigel v. Target Stores,* 122 F.3d 461, 466 (7th Cir.1997) (stating that the determination of whether one qualifies as a qualified individual with a disability "necessarily involves an individualized assessment of the individual and the relevant position"); *see also Heise v. Genuine Parts Co.,* 900 F.Supp. 1137, 1154 & n. 10 (D.Minn.1995) (holding that a "must be cured" or "100% healed" policy is a per se violation of the ADA because the policy does not allow a case-by-case assessment of an individual's ability to perform essential functions of the individual's job, with or without accommodation); *Hutchinson v. United Parcel Serv., Inc.,* 883 F.Supp. 379 (N.D.Iowa 1995) (same).

An independent "physical fitness" criterion is most troubling. In our view, this clause, when read in the context of the entire section of the collective bargaining agreement, is susceptible of more than one reading. We cannot be certain, in the absence of evidence in the record, that the parties to this collective bargaining agreement have interpreted that phrase as imposing an independent "physical fitness" criterion on the class members. Further examination of this issue in the district court is required.

### 4. The Interactive Process

 The plaintiffs' contentions on appeal culminate with a broad charge that Excel failed to engage in the interactive process required under the ADA. According to the plaintiffs, Excel's medical layoff policy and the procedures used to implement its policy violated the ADA by preventing all disabled employees from obtaining reassignment or reemployment in its plant after their injuries. First, the employees were not automatically bid on nonproduction jobs, which were the jobs most likely to accommodate their disabilities. However, because Excel informed the employees that they would be bid automatically on *every* job in the plant, the plaintiffs saw no reason to apply for them. Second, the "automatic bid" procedure precluded any chance for job accommodation. The employees could not come into the plant to review the job postings on their own; when they called the plant about jobs once a week, as required, a clerk told them there was no job—despite the fact that the record indicates that the class members were the most senior bidders on a given job. Third, the Excel nurses unilaterally determined on behalf of Excel that an employee was incapable of performing the job in question. There was no discussion of accommodation because there was no mention that a potential job existed. According to the plaintiffs, Excel terminated the accommodation dialogue before it began.

The plaintiffs further assert that the district court erred in believing that the class members caused the breakdown in communication; receiving Excel's "no job" message was the end of communications. Excel's con-

duct in telling plaintiffs there was no job falls short of the ADA standard that employers "pay[ ] careful attention to employees' requests ·for accommodation." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996). In addition, claim the plaintiffs, Excel's arbitrary exclusion of an entire class of jobs from the ·accommodation process (240 nonproduction jobs) violates the ADA.

Excel defends its policy and its implementation of the policy. It responds that its method for accommodating employees is an interactive process with those employees, once the employee has requested the accommodation. Its procedures actively foster the interaction: It sets aside temporary light-duty work for recuperating employees, provides detailed information on the physical demands of all jobs, provides meetings with the plant's nursing and ergonomics personnel to discuss the employee's restrictions and possible accommodations, offers a plant tour, automatically bids medically laid-off employees for every production job that opens, and urges employees to call in and discuss the bids. According to Excel, the district court properly held that these procedures more than meet the ADA requirements.

In our view, the record does not permit the conclusion that the ADA requirement of a flexible, interactive process that requires both the employer and the disabled employee to investigate cooperatively whether it is possible to accommodate the employee's disability has been fulfilled as a matter of law. *See Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir.1996). A reasonable trier of fact could determine that, once an employee's medical restrictions are determined to be permanent, Excel's methodology—the nurse's evaluation, the employee's meetings with the nurse and others, the plant tour, then layoff—was directive, not interactive. The record is also susceptible to the reading that the breakdown in the process cannot be attributed to the plaintiffs. *See Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633–34 (7th Cir.1998) (concluding that there was a genuine issue as to which party was responsible for the breakdown); *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285–86 (7th Cir.1996) (stating

that the party that fails to communicate with the other may break down the process and may be acting in bad faith). There are genuine issues of material fact concerning the lack of interaction in this case that preclude summary judgment. With all the information in the hands of Excel, this was not the kind of interactive process envisioned by our case law.

### Conclusion

Having evaluated the record in the light most favorable to the plaintiffs, we conclude that there is sufficient evidence to create genuine issues of material fact concerning Excel's medical layoff policy and its duty to make reasonable accommodations for them as disabled individuals. For the reasons set forth above, the district court's grant of Excel's motion for summary judgment is REVERSED and the case is REMANDED for further proceedings.

REVERSED and REMANDED.