MILLETT, Circuit Judge,
dissenting:
“Everything should be made as simple as possible, but not simpler.”[1] And therein lies the critical flaw in the majority opinion’s analysis. The opinion paints a logically alluring picture: Ella Ward sought an accommodation, but rather than give the Secretary of Veterans Affairs the information needed to provide it, she walked away. How could anyone blame the Secretary for that?
The problem is that the essential predicate for the majority opinion’s conclusion— that the June 5th letter to Ward from her supervisors sought only information “needed to ‘reasonably accommodate’ ” her, Maj. Op. 33 (emphasis added) — long ago evaporated. The Secretary admits that he did not need the demanded information to accommodate Ward; the letter sought nothing that was tied to the actual demands of her job; and the information demanded was irrelevant to ensuring that her requested flexiplace accommodation was practicable. The factual record, in other words, pulls the legal rug out from under the majority’s feet. Ward cannot be saddled with legal responsibility for failing to respond to questions her supervisors had no business asking. That is especially so because her increasing inability to properly treat her lymphedema in the office was literally endangering her life, making the delay caused by her supervisors’ unjustified factual detours acutely harmful.[2]
There are three essential points on which the majority and I part company:

1. The Flexiplace Work Option Never Before Required A Showing of Medical Condition

The majority opinion starts on the wrong track. It assumes that some showing of medical necessity and physical compatibility is a precondition for an employee in the Department of Veterans Affairs to work from home. Not so. As the majority opinion acknowledges, the Department’s flexiplace program is available to employees “whose job duties and performance records meet certain criteria.” Maj. Op. at 34 n. 5; see also J.A. 807. Ward came forward with evidence that her employment position and her “fully successful” rating qualified her to work at home under the program. J.A. 447. The majority opinion’s assumed predicate showing of “adequate medical documentation” (Maj. Op. at 35 n. 5) appears nowhere in the program criteria; it never even mentions physical condition.
Nor does the Secretary of Veterans Affairs contend that otherwise-qualified employees have had to make a threshold showing of medical need to enjoy the work-at-home option. At least not for any *37 employee other than Ward, whom the Secretary apparently chose to put on a different track with different demands because of her disability. J.A. 769. Perhaps the Secretary would say that he was concerned with how Ward would juggle her medical treatments and full-time work. But given that (i) Ward met the preexisting criteria for participation in the flexi-place program; (ii) Ward had already been working successfully full time in the office with her acute disability for the preceding two months, (iii) Ward had assured her supervisors that “I’m confident I would produce my three cases * * * if I could sit there in my [medically required state of undress] and prop my leg up and do what I need to do,” J.A. 565, and (iv) the presence of Ward’s disability is the only discernible reason for the supervisors’ distrust of Ward’s judgment, a jury could just as likely find that, by demanding that Ward make an exceptional showing not required of other flexiplace applicants, Ward’s supervisors got the accommodation process wrong from the get-go.
The majority opinion responds that normal flexiplace procedures did not entitle Ward to an “immediate[]” grant of her requested accommodation. Maj. Op. at 35 n. 5. No one said they did. The relevant question is whether a jury could find the accommodation process was needlessly prolonged. And, as the majority elsewhere acknowledges, it was after Ward had already spent “three months” (id. at 35 n. 5) meeting her supervisors’ evidentia-ry inquiries that the June 5th letter demanded that Ward chase down admittedly unneeded information.
2. The Information Demanded Was Irrelevant
While the majority opinion places dis-positive reliance on Ward’s supervisors’ need in the June 5th letter for more information, it is telling that the opinion never — not even once — says what extra information that letter sought. And that inquiry is what makes all the difference, because the Secretary has since confessed that not one bit of the information he sought was “needed to ‘reasonably accommodate’” Ward (Maj. Op. at 33), or has any relevance to any of the essential functions of Ward’s job. Not one.
The letter demanded that Ward have her physician document: “how many hours, in total, that you are able to work sitting at your desk reviewing case files and drafting decisions during the approved work day, i.e., during a continuous period from 8.5 to 10 hours”; and “whether you are capable of transporting case flies and a laptop computer back and forth to work at least once a week, which may weigh, collectively, up to about 45 pounds, and whether you can lift individual cases that may weigh over 25 pounds each, at home.” J.A. 247. The letter thus purported to identify three essential features of Ward’s job: (i) sitting, rather than standing or alternating positions, for long periods of time, (ii) completing work during a block of time lasting no more than ten hours per day, and (iii) carrying heavy case files in stacks of up to 25 pounds at a time. None of that holds true.
First, it was simply false to assert that Ward’s job as a lawyer requires that she “sit[ ] at [he]r desk * * * during a continuous period from 8.5 to 10 hours.” J.A. 247. In his deposition, Ward’s supervisor and the author of the June 5th letter, Steven Cohn, admitted that “[i]t wasn’t a question of, can you sit for a period of time; can you stand for a period of time,” since the need is just for employees to “be[] at home and doing the work[;] People at home — I mean, people can proofread and walk around.” J.A. 726-727.
*38 That makes sense. Ward is a lawyer whose job was to review cases and prepare draft decisions. She could do that sitting down; she could do that standing up; she could alternate positions; she could even do that walking around with a dictation machine., J.A. 754.[3] No one disputes that; Cohn admits it. So that portion of the supervisors’, letter sought information that was decidedly not “needed” (Maj. Op. at 33) to accommodate Ward.
Second, the Secretary undisputedly does hot demand that employees in the flexi-place program complete their work within a pre-set, ten-hour window in a given work day. The Department of Veterans Affairs Handbook specifically identifies a “modified work schedule” as a possible accommodation for a disabled employee. J.A. 268. In keeping with that policy, the Secretary has previously allowed a lawyer working from home in the flexiplace program to pick up case files “other than during [her] official duty day,” including “during the workweek or evening, or on the weekend[J” J.A. 815. And Jonathan Kramer, another of Ward’s supervisors, admitted in his deposition that a modified work schedule “would suffice as a possible reasonable accommodation for an employee with a disability,” but that he “did not think about” that possibility, J.A. 499-500, notwithstanding Ward’s request for such flexibility. Thus, the supervisors’ insistence that Ward document her ability to complete her work within a rigid ten-hour block of time was a makeweight.
Third, while the letter insisted that Ward document her physical ability to carry heavy case files, Cohn again gave away the game, admitting the irrelevancy of that demand. Cohn’s letter itself acknowledged that “the Board can assign a cart for you to use, or you can always ask me or [an]other management official on the team for assistance in transporting any heavy case files.” J.A. 246. That accords with the Board’s treatment of another of Ward’s colleagues in the flexiplace program, who was allowed to have her “husband or another individual assist [her] in transporting [work] materials to [her] Alternate Work Station[.]” J.A. 815. What is more, Kramer admitted in his deposition that, at home, Ward could have moved the necessary documents piece by piece, rather than all at once in heavy stacks. See J.A. 493. Weight-lifting, in short, is confessedly not an essential element of Ward’s lawyer position or required for a reasonable accommodation to work. So when the majority opinion says the supervisors’ demand for proof that Ward “can lift individual cases that may weigh over 25 pounds each, at home” was seeking “precisely the information it needed to ‘reasonably accommodate’ ” her, Maj. Op. at 33, that is just not correct.
The majority opinion points to the requirements for the flexiplace program. Maj. Op. 34-35 n. 5. They prove my point: prolonged sitting and heavy lifting make no appearance.' The policy instead lists “[p]osition suitability,” which is undisputed for Ward’s job; and a jury could reasonably find Ward “reliable, responsible, and able to work independently” given her work record, as a long-term and “fully successful” employee, and her persevering service even with her disabling condition. See id. The majority opinion’s reference to “adequate medical documentation” submitted by others (id.) is even harder to understand, because, again, not one of those employees was asked about sitting endurance or dead-lifting case files.
*39 The majority opinion reasons that, even though irrelevant to Ward’s job performance, the information sought in the June 5th letter was “unquestionably relevant in determining a reasonable accommodation.” Maj. Op. at 35 n. 6. But not even the Secretary argues that any such showing of physical conditioning is needed to work at home rather than in the office. Nor was any such showing demanded of any other employee — disabled or not.
If more were needed, the supervisors’ abrupt reversal of course on August 8th provides it. Without having received one bit of the information that the majority opinion deems so essential to granting Ward an accommodation, the Secretary offered Ward the opportunity to “try work-from-home on a full-time basis.” J.A. 261. The Secretary confirmed at oral argument that, in the August 8th letter, the supervisors decided to “try what she’s asking for.” Oral Arg. Tr. at 18:7-18:8. But the supervisors knew no more in August than they knew in June. If no more information was needed to “try what she’s asking for” in August, it could not have been “unquestionably relevant” just two months earlier. Presumably, the pointlessness of the June 5th inquiry is why the Board of Veteran Appeals’ Assistant General Counsel advised those supervisors in August that they “should have just offered, at that point, offered the arrangement she requested.” J.A. 769.
To that, the majority opinion simply asserts that “the [Department’s] offer in the face of litigation cannot be viewed as evidence of pretext.” Maj. Op. 33 n. 4. But this is summary judgment, so the question should not be how appellate judges view the evidence, but whether a reasonable jury could view things differently based on not only the August 8th reversal of course, but also the Department’s admissions that the information was unneeded and its failure to demand a similar showing from any other employee admitted into the flexi-place program.
Finally, counsel for the Secretary protested at argument that Ward “wasn’t entitled to get the position,” but that the Secretary offered it anyway because “they liked her, they thought she was a good employee.” Oral. Arg. Tr. at 19:2-19:7. Counsel cannot mean what he said. Surely the Secretary would not expend taxpayer money giving Ward a make-work sinecure. Nor, given her “fully successful” rating and proven ability to perform her job for two months even under the physically onerous conditions of in-office work, J.A. 447, does the record foreclose a reasonable jury from finding that she was a qualified individual with a disability. Instead, counsel could only have meant the Secretary felt legally entitled to delay her accommodation until she ran a gauntlet of intrusive and entirely unnecessary questioning.

3. Ward’s Supervisors Obstructed the Accommodation Process

Because the Secretary’s concessions expose the June 5th letter’s informational demands as a contrivance, the majority opinion’s discussion (Maj. Op. at 33-34) of case law permitting employers to seek “critical” information that is genuinely “needed” to formulate a reasonable accommodation is quite beside the point. Far from requesting needful information, the Board demanded that Ward have her physician certify to a litany of irrelevancies. And her supervisors did so not in the heat of the moment during a meeting, but after fully considering their position for five days after the May 31st meeting. A reasonable jury thus could find that this case involves supervisors throwing up obstacles to an accommodation that were not applied to other employees and that have no bear *40 ing on the reasonableness of the accommodation sought. That employers may not do. See, e.g., Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 695-696 (7th Cir.1998) (refusing to grant summary judgment to an employer because it may not have participated in good faith in finding accommodation); Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir.2000) (same).
The majority opinion emphasizes that the employer never failed to respond “in some manner” to Ward. Maj. Op. at 33 (quoting Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1136 (7th Cir.1996)). True. But the accommodation process is not a verbal game of tag in which the last person to say something wins. The point of the interactive process is to exchange the information needed to determine whether a reasonable accommodation of a qualified individual can be made.
In this case, as the majority opinion suggests (Maj. Op. at 33 n. 3), the facts taken in the light most favorable to Ward show that her supervisors cut off the accommodation process at a meeting on May 31st when they laughed at her, humiliated her, and denied her request to work at home full time unless and until Ward met their demands for unneeded information. J.A. 580-581. On that record, a jury could find that the employer’s demands amounted to stonewalling, and thus that it is the employer that broke down the process. Id. at 580 (Ward: “I’m trying to get here to do my job. You know I’m suffering, and * * * you’re dragging your feet on it.”). And while the majority opinion concludes that the June 5th letter saves the day, Maj. Op. 33 n. 3, that rationale simply cannot survive a review of the letter’s content and the Secretary’s admissions.
The costs of such delaying inquiries, moreover, can be dire for some individuals with disabilities, as this case illustrates. Ward’s lymphedema can be life threatening, and working full time at the office while her supervisors debated giving her the already-established flexiplace option was taking a severe physical toll on Ward. J.A. 195, 600. Insisting, as her supervisors did in that June 5th letter, that she go back to the well for information no one needed before giving her the accommodation was anything but the harmless delay that the majority opinion posits (Maj. Op. at 34-35 n. 5).[4]
* * * * * *
What actually happened in this case— who is right and who is wrong — is for a jury, not an appellate court, to decide. All that matters at this juncture is that, once the actual content of the June 5th letter and the Secretary’s admissions are factored in, a reasonable jury could disagree with the majority opinion that Ward’s supervisors were just seeking “information [they] needed to determine the appropriate accommodation” (Maj. Op. at 34), and could instead find that it was Ward’s supervisors that obstructed the accommodation process.
For five years, Ward proved herself a hard-working, fully successful attorney for the Department of Veterans Affairs. All she asked for was the same flexiplace program afforded other employees in her position, whether or not they were disabled. Her supervisors’ withholding of that readily available accommodation until she chased down admittedly unneeded infor *41 mation is precisely the type of conduct the Rehabilitation Act was meant to stop — or so a jury could find. I respectfully dissent.

. See The Ultimate Quotable Einstein 475 (Alice Calaprice ed.2011).

. While the ultimate determination of the facts should be for the jury, this dissent views all of the disputed material facts in the light most favorable to Ward, as the law requires. See, e.g., Mogenhan v. Napolitano, 613 F.3d 1162, 1165 (D.C.Cir.2010).

. Indeed, adjustable and standing desks have become commonplace. See, e.g., Steve Lohr, Taking a Stand for Office Ergonomics, New York Times, Dec. 1, 2012, http://www.nytimes. com/2012/12/02/business/stand-up-desksgaining-favor-m-the-workplace.html.

. The district court granted summary judgment on Ward’s constructive discharge claim for the same flawed reasons it turned away her accommodation claim, Ward v. Shinseki, No. 10-cv-1414 (RLW), 2012 WL 5839711, at *10 (D.D.C. Nov. 19, 2012), so I would remand to the district court to reconsider that claim in the first instance.