Ed WILLIAMS, Plaintiff,

v.

**EASTSIDE LUMBERYARD AND SUPPLY COMPANY, INC.,** Defendant.

No. 99–CV–4237–JPG.

United States District Court, S.D. Illinois.

March 23, 2001.

Gene A. Turk, Jr., The Law Office of Gene Turk, Carbondale, IL, for Plaintiff.

Don V. Kelly, Ross A. Friedman, Gallop, Johnson, et al., St. Louis, MO, for Defendant.

## MEMORANDUM OPINION AND ORDER

GILBERT, District Judge.

Plaintiff Ed Williams ("Williams") is suing his former employer, Defendant Eastside Lumberyard Supply Company ("Eastside"), for violating the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and Illinois law prohibiting retaliatory discharge. Williams claims that, after work-related injuries, Eastside failed to reasonably accommodate those injuries by not awarding him a permanent light-duty position (Count 1), and by later firing him because of his accommodation request (Count 2). Williams also claims Eastside fired him because he attempted to exercise his rights under the Illinois worker's compensation statutes (Count 3). Now before this Court is Eastside's summary judgment motion, Williams' response, and Eastside's reply (Docs.21, 25, 26, 29). For the following reasons, Eastside's motion for summary judgment on the ADA claims is granted, and Williams' state retaliatory discharge claim is remanded back to state court.[1]

### I. BACKGROUND

Eastside supplies building materials to about 150 lumberyards and other companies in Southern Illinois. Its business employs about 10 to 12 warehouse employees to pack and ship upwards of 100 to 200 shipping orders daily. In March, 1993, Eastside hired Williams as a Driver/Warehouseman. On September 1, 1998, Eastside placed him on inactive job status and ultimately fired him on April 6, 1999. Williams claims that Eastside's behavior violated the reasonable accommodation and the anti-retaliation provisions of the

---

1. This case was originally filed in state court, after which it was removed to this court under the federal removal statute, 28 U.S.C. § 1441. *See Spearman v. Exxon Coal USA, Inc.,* 16 F.3d 722 (7th Cir.1994).

ADA and constituted the tort of retaliatory discharge under Illinois law.

### A. *The Driver/Warehouseman Position*

Eastside hired Williams as a Driver/Warehouseman. Drivers and Warehousemen work side by side at Eastside. Both must be able to load and unload trucks with the same products in the Eastside warehouse. Thus, the essential functions of the Driver and Warehouseman positions are essentially identical, save for one caveat: Drivers have commercial drivers' licenses and Warehousemen do not. So Drivers must be able to drive semi-trucks as well as be able to load and unload the deliveries, while Warehousemen stick to the loading and unloading.[2] There are various essential job functions common to both Drivers and Warehousemen.

First, a Driver/Warehouseman must be able to load and unload trucks by hand. Eastside stores its products (*e.g.*, vinyl molding, aluminum roof vents, Styrofoam, windows, cabinets, roof shingles, nails and screws) on pallets or in stacks which may be on the floor of its warehouse. Drivers pull their trucks up to the loading area to pick up a delivery. Warehousemen load the truck by forklift and by hand. Drivers must be able to do the lifting themselves because, while normally two people participate in loading a truck, sometimes other employees are unavailable to help the Driver load his truck. After arriving at the delivery stop, Drivers sometimes have to unload their truck.

Customers also show up at the Eastside facility where Drivers and Warehousemen have to wait on them. Because customers sometimes order less than a full pallet of goods (which would apparently be loadable by forklift), Drivers and Warehousemen must be able to load the purchased goods by hand. This requires both lifting the products up from the floor and putting them on fresh pallets and manually moving items from the stacked pallet of goods to a clean pallet on which various items can be stacked, wrapped for delivery, and moved onto the truck.

Eastside's goods are heavy and require manual lifting. Some of the items that Drivers and Warehousemen must be able lift by hand include: 5–gallon buckets of adhesive (50–60 pounds); boxes of nails (50 pounds); vinyl sheeting (20–100 pounds); flats of roof shingles (60—80 pounds); and vinyl siding (70–80 pounds).[3] These products must be lifted when they are brought to the Eastside warehouse, taken off the trucks and put into inventory, and pulled to fill customer orders.

Eastside customers generally assist in unloading their orders. However, because their help is sometimes unavailable, Drivers must be able to unload the goods to ensure that the Eastside materials brought to a customer's facility are taken off his truck.[4] Some customers have no forklift, so their orders must be unloaded by hand.

---

**2.** Williams would drive flatbed tractor-trailers and make route deliveries to deliver building supplies.

**3.** Roof shingles are not sold in full pallets (loadable by forklift), but are sold in job lots. So, when loading shingles, Drivers and Warehousemen would have to manually stack packets of shingles to make the job lot, a job that requires handling packages of shingles weighing sixty to eighty pounds. Two people are often utilized to lift and load bulky items.

Items such as 50–pound boxes of nails are simply not amenable to being carried by two people due to their small size. On some days, over a hundred boxes of nails need to be loaded.

**4.** Because Eastside's business is time-sensitive, a Driver lacking the assistance of a customer cannot sit around all day waiting for a customer's help. Drivers must be able to unload their truck themselves.

Customers buy a variety of products, items such a shingles, nails, paneling or molding, which are unloaded by hand. In the case of shingles, once delivered to a customer, the shingles would have to be unloaded from the truck by manually stacking them down on the ground or on a pallet. And, though items such as garage doors, gutters, steel and aluminum normally take two people to unload, occasionally a Driver will have to unload these items himself.

In sum, the most essential job function of both the Driver and Warehouseman positions is the physical ability to handle, carry, and stack items weighing up to 75 to 80 pounds, *i.e.*, the physical ability to do heavy lifting.

Second, Drivers/Warehousemen have to twist, bend, squat, and move about too. Williams' job required twisting and bending, and lifting by squatting. Once items are stacked on clean pallets, they are shrink-wrapped. Shrink wrapping secures the items in place and involves a lot of moving up and down the load to ensure it is bound by the wrap.

Third, a Driver, as was Williams, must be able to have the ability to drive between 200 and 400 miles a day. In Williams' case, he would drive 800 miles in a typical week.

These essential functions for Drivers/Warehousemen positions were committed to writing by Eastside in 1995 or 1996. Williams acknowledges that Eastside's list accurately sets forth the essential job functions for Drivers/Warehousemen.

## B. *The Injury And Initial Medical Treatment*

In October, 1995, Williams was unloading vinyl siding and hurt his back. Afterward, Williams received some initial medical treatment, which culminated in the removal of two herniated discs by Dr. Sherwyn Wayne in December, 1995. While recuperating from surgery, Dr.

Wayne gave Williams lifting restrictions and released him to go back to work. Eventually, Dr. Wayne released Williams to full duty in July or August, 1996.

After three days of working at full duty, Williams asked to be returned to light duty, which involved a 25–pound lifting restriction given by another one of Williams' physicians, Dr. Parks. Assuming that William's inability to go back to full duty was only temporary, Eastside assigned Williams various light-duty tasks. For example, Eastside allowed Williams to load drywall on trucks using a forklift and then to deliver drywall to customers. This "drywall delivery" task required no manual lifting and permitted Williams to work part-time, picking up some 20 to 30 hours a week.

Williams continued to see doctors to treat his back injury from 1996 to 1998, and in the fall of 1997, Williams started receiving vocational rehabilitation as part of his workers' compensation benefits.

## C. *August 31, 1998 and September 1, 1998*

On August 31, 1998, Williams was seen for the first time by Dr. Matthew Gornet, a neurosurgeon. Dr. Gornet recommended Williams stop driving because that could do further damage to his lower back. Williams told Fran Whipps, his rehabilitation counselor, that as a result of his medical condition, he did not think he should continue his job searching activities. Whipps contacted Eastside. When Whipps contacted Eastside, Eastside was unaware of any new injury, need for treatment, or restrictions.

On September 1, 1998, Williams met with David Reis, Don Reis, Sr., and Don Reis, Jr., of Eastside. At that time, Williams did not disclose Dr. Gornet's recommendation that he discontinue driving for Eastside because he thought it was

none of their business. That day, Williams was placed on inactive job status.

### D. The Second Surgery, Current Medical Condition, And Functional Capacity

In November, 1998, in a two-part surgical procedure conducted over several days, Dr. Gornet performed a back fusion operation on Williams. In this procedure, Williams had titanium screws and hardware placed into his back along with portions of his hipbone. As a result of this surgery, Williams was further limited. Williams is (1) at high risk to sustain further injury and disability if he returns to work as a Driver, (2) medically restricted from lifting greater than 25 pounds, (3) medically restricted from repetitive bending, (4) medically restricted from bending from a squatting position, and (5) medically restricted from repetitive twisting and turning.

Dr. Gornet's restrictions are accurate, valid, and now permanent. Williams can lift only items weighing less than 25 pounds, and he requires the assistance of a "lifting helper" if he wants to carry anything over 25 pounds. Williams is unsure, given his restrictions, whether he could do the shrink wrapping required to secure goods loaded onto pallets.

### E. Events of April 5, 1999 and April, 6, 1999

On April 5, 1999, Williams returned to Eastside and presented a letter from Dr. Gornet addressed to the attorney handling Williams' workers' compensation claim stating:

Because of his type of work, I believe [Williams] would be at high risk to sustain further injury and disability if he returned to work as a truck driver. Currently I would place the following restrictions on him[:] no lifting greater than 25 pounds, no repetitive bending, no bending from a squatting position, [and] no repetitive twisting and turning.

According to Williams, he was asked to provide a statement of restrictions or medical clearance indicating he could return to work.

On April 6, 1999, Dr. Gornet's office faxed a statement of restrictions to Eastside, setting out essentially the same restrictions as in his March, 1999, letter. According to Williams, when he came to Eastside later that morning, he was given a letter advising him that he was terminated because he could not perform the essential functions of his job.

### F. Williams' Requested Accommodation

Williams admits he cannot perform the job of Driver/Warehouseman without an accommodation. As an accommodation, Williams wants a permanent light-duty job, consisting of delivering drywall and loading/unloading only items that weigh less than 25 pounds or that are able to be lifted with a forklift. There are no other accommodations Williams feels he needs.

### G. Eastside's Available Jobs In April, 1999

There is no job at Eastside with duties that require only drywall delivery. While he was on light duty and was given the task of delivering drywall, the most Williams could work was 20–30 hours a week. Some days there is no drywall to haul. There is no one at Eastside who works a 40–hour week just delivering drywall. Drywall is just one task a truck driver may be called upon to perform.

Williams' job as Driver/Warehouseman required that he be a union member. The union jobs at Eastside were confined to driving or working in the warehouse. Aside from union jobs, the only other jobs at Eastside, are office jobs. No job vacan-

cy, union or non-union, existed at the time of Williams' discharge.

### H. *Williams' Complaints And Charges Against Eastside*

Williams' displeasure with Eastside stems from three events: (1) not getting enough work while on light duty between August, 1996 and the Fall of 1998,[5] (2) being placed on inactive duty status on September 1, 1998, and (3) his April 6, 1999, termination.

On December 20, 1997, Williams filed a charge of discrimination, claiming he had been denied work at Eastside that would accommodate his disability. On March 25, 1999, Williams signed another charge of discrimination against Eastside, this time claiming he was discriminated against when he was placed on inactive duty status.

### II. *STANDARD*

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Courts must view all evidence in the light most favorable to the nonmoving party and draw all inferences in the favor of that party. *See id.* at 255, 106 S.Ct. 2505. If the nonmoving party fails to establish the existence of an element essential to its case, summary judgment is proper. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, the nonmovant must "come forward with specific facts showing that

there is a genuine issue for trial." *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir.2000). It is not, however, the task of the Court to "scour the record" in search of a genuine issue because this Court relies on the nonmoving party to identify, with particularity, the evidence that militates against summary judgment. *See Richards v. Combined Ins. Co. of America*, 55 F.3d 247, 251 (7th Cir.1995).

### III. *DISCUSSION*

Williams advances three claims against Eastside: (1) an ADA failure to accommodate claim, (2) an ADA retaliation claim, and (3) a state law retaliatory discharge claim. This Court addresses each one in turn.

### A. *The ADA Failure To Accommodate Claim*

Williams claims that Eastside failed to reasonably accommodate his bad back. The ADA proscribes discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, ... and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). The ADA also provides that an employer discriminates against a qualified individual with a disability by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability...." 42 U.S.C. § 12112(b)(5)(A).

■ To state a prima facie case of "failure to accommodate" disability discrimination, a plaintiff must first show that (1) he

---

**5.** Williams never develops this allegation. He admits not knowing of any drywall work that Eastside failed to give him and fails to cite any evidence of specific jobs that Eastside should have given him between 1996 and 1998.

was or is disabled; (2) his employer was aware of his disability; (3) he was a "qualified individual" for the position he held. *See E.E. O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000); *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558, 563 (7th Cir.2000).[6] It is the "qualified individual" requirement that Eastside argues Williams cannot satisfy.

▇ A "qualified individual" is defined in relevant part as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir.1996). A plaintiff must therefore show he has "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." and is able to "perform the essential functions of the position held or desired, with or without reasonable accommodation." 29 C.F.R.App. § 1630.2(m); *see* 42 U.S.C. § 12111(8) (a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *Cochrum*, 102 F.3d at 912. The plaintiff bears the burden of proof to show he is a "qualified individual." *See Cochrum*, 102 F.3d at 912 (citing *De-Luca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995)).

▇ In terms of his Driver/Warehouseman position, Williams admits that he could not—and cannot—perform the most essential of all job functions: heavy lifting. Being an Eastside Driver/Warehouseman is a physically demanding job, requiring a lot of heavy lifting (*See* Doc. 27, Ex. E,

Johnson Affidavit; Doc. 27, Ex. F, Heartland Rehabilitation Videotape). Eastside committed this essential function to writing in 1995 or 1996, noting that Drivers/Warehousemen must be able to safely lift at least 75 pounds (Doc. 27, Ex. B, Reis Dep. at p. 11; Ex. C, Driver Job Description; Ex. D, Warehouseman Job Description). In fact, both parties agree that one of the essential job functions of the Driver/Warehouseman position is the ability to lift items weighing up to 80 pounds (Doc. 23, Joint Statement of Uncontested Material Facts, ¶ 29, "To do his job, a truck driver/warehouseman must physically be able to handle, carry and stack items weighing up to 80 pounds."). Because Williams is—and continues to be—physically limited in lifting anything over 25 pounds, he admittedly could not and cannot perform the most essential job function of a Driver/Warehouseman: heavy lifting. *See id.* at 912.

Williams submits that he is still a "qualified individual" under the ADA because if Eastside implemented what he believes to be a reasonable accommodation for his disability, he could perform the job. The only accommodation Williams identifies that he needs is for Eastside to award him a permanent light-duty position. According to Williams, this permanent light-duty position should consist of only two functions: (1) delivering drywall and (2) loading/unloading items that weigh less than 25 pounds or can be loaded/unloaded with a forklift (Doc. 23, ¶ 83).

Williams' asserted accommodation is, however, unreasonable. Therefore, he cannot show that he can perform the essential job functions of a Driver/Warehouseman with any *reasonable* accommodation.

---

**6.** Courts imply that these elements implicitly require the plaintiff to also show that the employee suffered an adverse employment ac-

tion at the employer's hands. *See Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1032 (7th Cir.1999).

First, asking an employer to eliminate an essential job function so that the employee can perform the remaining essential job functions is not a request for a reasonable accommodation. *See Cochrum*, 102 F.3d at 913 ("[R]easonable accommodation does not encompass reallocation of essential job functions."). Eastside was, therefore, not required to eliminate the most essential job function of a Driver/Warehouseman: heavy lifting. Nor was Eastside required to assign Williams a permanent "lifting helper" so that Williams could lift the heavy items in the warehouse. *See id.* at 912 ("We cannot agree that [plaintiff] would be performing the essential functions of his job with a helper.").

Second, Williams has not shown that a request to be reassigned to a vacant position would have been a request for a reasonable accommodation. Granted, the ADA may require moving or reassigning an employee to a vacant position as a possible accommodation. *See id.* at 913. However, "[t]he plaintiff bears the burden of showing that a vacant position exists and that the [he] is qualified for that position." *Pond v. Michelin North America, Inc.*, 183 F.3d 592, 595 (7th Cir.1999). Here, the parties agree that no job vacancy, union or otherwise, existed at the time of Williams' discharge (Doc. 23, ¶¶ 91–94). Moreover, Williams failed to adduce any evidence that any vacancy existed anytime between September 1, 1998 (date placed on inactive duty) and April 6, 1999 (date of termination). Because Williams failed to adduce any evidence of such a vacancy, Williams has not shown that a request for reassignment to a vacant position would have been a request for a reasonable accommodation.

Third, after presumably realizing that no vacancy existed during the relevant time, Williams seems to argue that Eastside should have created a new position with new essential job functions to accommodate him. Creatively, Williams has fashioned his own permanent "drywall delivery/light lifting" position that he thinks he could perform with notable success. However, the ADA does not require an employer to create a new position as a reasonable accommodation at the employee's request. *See Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998) ("Nor is an employer obligated to create a 'new' position for the disabled employee."); *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir.2000) (holding that "an employer is not required to provide the particular accommodation that an employee requests"). Here, Williams has adduced no evidence that such a permanent "drywall delivery/light lifting" position existed at Eastside. There was no— and there is still no—permanent "drywall delivery" position at Eastside (Doc. 23, ¶¶ 85, 94). Drywall delivery is just one task a Driver may be called upon to perform (Doc. 23, ¶ 89), and some days there is no drywall to haul at all (Doc. 23, ¶ 87). Williams' request for an accommodation would be tantamount to a request that Eastside create a new permanent position (*i.e.*, the permanent drywall delivery/light lifting position). The ADA does not requires this type of accommodation. Therefore, Williams' request for the creation of a permanent "drywall delivery/light lifting" position was not a request for a reasonable accommodation. *See Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 485 (7th Cir.1997).

What Williams actually argues is that, by allowing him to perform various light-duty assignments for two years while Eastside assumed that his condition was temporary, Eastside conceded that some of the job functions were actually "nonessential" to being a Driver/Warehouseman. However, this would mean that any

temporary light-duty assignment created a factual issue whether the essential job functions of the original position, which the employee's temporary condition prevented him from performing, were actually essential. Employers would stop offering temporary light-duty assignments to accommodate temporary disabilities, fearing that their temporary elimination of certain essential functions of the job for those temporarily-disabled employees would force them to make their elimination permanent. Williams cites no case law in support of such a proposition. Like other courts, this Court finds this argument unconvincing. *See Laurin v. Providence Hosp.,* 150 F.3d 52, 60–61 (1st Cir.1998) ("An employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation...."); *Amadio v. Ford Motor Co.,* 238 F.3d 919, 929–930 (7th Cir.2001) (noting that "if an employer 'bends over backwards to accommodate a disabled worker ... it must not be punished for its generosity'"); *cf. Basith v. Cook County,* 241 F.3d 919, 929 (7th Cir.2001) (holding that "[t]he mere fact that others could do [the work of plaintiff on light duty] does not show that the work is nonessential" and that "[t]he fact that restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job.").

■ Williams pressed no other arguments. Instead, like too many other plaintiffs, Williams simply recited the facts of the case. *See Malabarba,* 149 F.3d at 692 ("There is an old adage among lawyers that, when the law is not on your side, you should attempt to confuse the court or jury with your spin on the facts."). A judge is the impartial umpire of legal battles, not a plaintiffs' attorney. He is neither required to hunt down arguments plaintiffs keep camouflaged, *see United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles bur-

ied in briefs."), nor required to address perfunctory and undeveloped arguments, *see United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991) (making clear that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"); *John v. Barron,* 897 F.2d 1387, 1393 (7th Cir.1990) (noting that briefs "plainly require[ ] more than a one page argument unsupported by any authority"); *United States v. Mason,* 974 F.2d 897, 901 (7th Cir.1992) (failure to cite case law or identify facts from the record in support of argument waives an argument on appeal); *United States v. Fazio,* 914 F.2d 950, 959 n. 15 (7th Cir.1990). A plaintiff's recital of the facts of the case triggers no duty on the part of the judge to research, construct, and further research the best legal arguments he can for that fact-reciting party. *See United States v. Amerson,* 185 F.3d 676, 689 (7th Cir.), *cert. denied,* 528 U.S. 1029, 120 S.Ct. 549, 145 L.Ed.2d 427 (1999) ("Given our adversarial system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (internal citations and quotations omitted). Thus, to the extent that Williams failed to develop any additional argument or provide any legal support for them, he has waived them.

■ Williams' best argument—one he did not make—would have been that Eastside intended Williams' light-duty assignments to last forever. However, Williams never mentions the words "permanent" or "temporary" in relation to his light-duty assignments and cites to absolutely no case law whatsoever in this section of his brief. As stated, this Court declines to do the legal work that Williams' attorney should have done. *See Amerson,* 185 F.3d at 689. Doing so would place this Court in the

unenviable position of plaintiff's attorney, and it would be highly unfair to require defendants to always respond to an argument that was not sufficiently raised by their adversary.

Even if Williams had made that argument and developed it, this Court would nonetheless reject it. The question would have been whether Williams had adduced sufficient evidence that Eastside intended his light-duty assignments to last forever. Had the light-duty assignments been permanent, a new position would have presumably been created in the process with new essential job functions, and Williams would have to show that he was a "qualified individual" as to that new permanent light-duty position.[7] However, had the assignment been temporary, no new position would have been created in the process, and the ADA would not have required Eastside to convert Williams' temporary light-duty assignments into permanent ones as a reasonable accommodation. *See Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 697 (7th Cir.1998).

In this case, there is no evidence that Eastside ever intended on giving him a permanent light-duty position. First, there is no evidence that Williams had a permanent disability at the time he was doing his light-duty assignments. Williams admits that he was assigned light-duty work for his lower back condition "on the assumption his condition would be temporary" (Doc. 23, Joint Statement of Facts, ¶ 51). Eastside Manager David Reis testified that Williams came back with "temporary restrictions" (Reis Dep. at p. 106). Williams continued his medical treatment and continued to go to various physicians who "continued" his 25–pound restriction. Eastside found available light work for Williams to do *while* he received additional medical treatment and vocational rehabilitation which extended into 1998 (Doc. 23, ¶ 60; Williams Dep. at p. 31). Thus, the undisputed facts show that Eastside believed that Williams' back condition, which was temporarily preventing him from performing all the tasks of his Driver/Warehouseman position, was not permanent.[8]

Second, there is no evidence that Eastside intended Williams' various light-duty assignments to last forever. There is no

---

7. The *Basith* decision appears to be in tension with even this conclusion. *See 241 F.3d 919.* There, it was quite clear that, unlike allowing an employee to do available light work around his place of employment, the employer formally created a new position for the plaintiff where his new job responsibilities "did not require him to do delivery...." *Id.* at 925. The plaintiff therefore claimed "that delivery was not an essential function because [the employer] created a position for him ... which did not require delivery." *Id.* at 930. The Seventh Circuit rejected that argument, however, holding that "the evidence established that delivery was an essential function[,]" primarily because the employer's creation of the "special assignment" for the plaintiff was more akin to a job restructuring, which would relieve the plaintiff from the obligations of doing all of the essential functions of his job while he was in that "special assignment." *Id.*

8. Apparently, in early 1997, Dr. Lange evaluated Williams and "noted that [he] *might* require some permanent restrictions in regard to [his] occupation" (Williams Dep. at p. 42). Williams admits that he does not specifically recall what Dr. Lange said (Williams Dep. at p. 42). Later, Williams again saw Dr. Lange in April, 1997, but never recalls Dr. Lange saying that his "current limitations regarding [his] back were permanent" (Williams Dep. at p. 48). Again, in May, 1997, Williams' new physician "continued" the restriction (Williams Dep. at p. 39, "Q: ... It looks like in each of those reports that through May of '97 Dr. Parks continued your 25–pound lifting restriction. A: Yes."). If the restriction was permanent at that point, there would be no reason why it would need to be "continued." In any event, Williams has not made it clear of which reports Eastside was made aware.

permanent light-duty position available at Eastside (Reis Dep. at p. 106). While Eastside does allow temporarily-injured employees to hold *temporary* light-duty positions, Eastside has a "policy" of not creating *permanent* light-duty positions (Reis Dep. at p. 106).[9] The only evidence here shows that, when Williams came back to work, he came back to work "on a temporary basis" (Reis Dep. at p. 106) and, as Williams admits, "on the assumption his condition would be temporary" (Joint Statement of Facts, ¶ 51). Also, Williams constantly refers to himself as being allowed to work *on* light-duty doing Driver/Warehouseman tasks, not *having* a permanent light-duty position. (Doc. 23, ¶¶ 86, 89, "*While* he was on light duty ... he was given the task of delivering drywall" which "is just one task a truck driver may be called upon to perform."). There are numerous other examples (Doc. 23, ¶ 56, "Despite being on light duty"; ¶ 59, "while on light duty"; ¶ 95, "while on light duty").

Williams admits he "worked for East Side as a truck driver and warehouseman" (Doc. 23, ¶ 5). He hurt his back in October, 1995, while loading some vinyl siding (Doc. 23, ¶ 45) and had back surgery in December, 1995. Between December, 1995 and July, 1996, Williams was "given lifting restrictions" and put on "light duty" as a result his back surgery (Doc. 23, ¶¶ 47–49). In July, 1996, Williams was released from light duty and went back to "full duty." After working a short time on "full duty" he asked to be "returned to light duty" with the lifting restrictions (Joint Statement of Facts, ¶ 49; Williams Dep. at p. 127, admitting "working 20 to 30

hours a week since [he'd] been *returned* to light duty in '96"). The only logical inference, therefore, is that, in July, 1996, when he *"returned"* to the light-duty assignments he was doing between December, 1995 and July, 1996, he was not returning to permanent light-duty work because the pre-July, 1996, light-duty assignments were temporary as Williams admits he ultimately "returned to full duty" work afterward (Doc. 23, ¶¶ 48–49). While enumerating the "duties" he had after July, 1996 (Doc. 24, at p. 7, ¶ 5), he admits elsewhere that these were simply available "tasks" that Eastside had given him after he had *"returned* to light duty" in July, 1996 (Doc. 23, ¶¶ 49, 50). Williams himself admits that he was returned to light-duty work after July, 1996 "on the assumption his condition would be temporary" (Joint Statement of Facts, ¶ 51). Williams therefore "returned" to doing the same temporary light-duty assignments that he was doing prior to July, 1996 (Doc. 23, ¶¶ 48, 49).[10]

Given the undisputed evidence that Williams' disability was temporary, that Eastside thought it was temporary when it provided him with various light-duty assignments, that there is no evidence that a permanent light-duty position ever existed at Eastside, and that it was Eastside's policy not to create permanent light-duty assignments, the only reasonable conclusion would be that the makeshift light-duty assignments at the warehouse were not intended to be permanent. *See Norsworthy v. Kroger Co.*, 202 F.3d 269, 2000 WL 32026 (6th Cir. Jan.6, 2000) (Table) (a position that is not a "previously-existing va-

---

9. Williams himself vigorously argues that "Eastside has a policy of not allowing any[one] to work under permanent light duty restrictions" (Doc. 25 at 2).

10. If Williams had been arguing that the accommodation he received for his back prob-

lems was reassignment to a permanent light-duty job, he would not now be arguing that "Eastside still *should have* considered reassignment as one form of accommodation" (Doc. 25 at 6).

cant position" created only to accommodate an employee's temporary condition is presumed temporary absent contrary evidence); *Fjellstad v. Pizza Hut of America, Inc.*, 188 F.3d 944 (8th Cir.1999) (assuming a "co-manager" arrangement implemented for nine months was temporary by the nature of arrangement); *Martin v. Kansas*, 190 F.3d 1120, 1132, 1133 (10th Cir. 1999) (assuming tower-duty assignment held by correctional officer for three years was not permanent because of prison's policy that officers would rotate, a prison statement that "no permanent light duty positions assignments existed" at the prison, and the fact that plaintiff was originally hired for the broader job of correctional officer not tower guard); *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996) (stressing that the light-duty assignment "was not an official position, but had been created" to accommodate employee's temporary condition); *Malabarba*, 149 F.3d at 697 (noting that employer "did not maintain any permanent 'light-duty' positions" and crediting employer's general policy about whether light-duty assignments were considered temporary or permanent).

█ While Eastside did accommodate Williams' temporary condition for two years, the duration of an arrangement to accommodate an employee's temporary condition is not, by itself, sufficient to show that the arrangement was meant to last forever. *See Hendricks–Robinson*, 154 F.3d 685 (holding that "the temporary nature of a light-duty program should not be adjudged by the absoluteness of the time period in which an injured employee may participate"); *Norsworthy*, 202 F.3d 269 (light-duty accommodation for seven months was not permanent); *Fjellstad*, 188 F.3d 944 (reduced-work-schedule accommodation which existed for nine months was not permanent); *Martin*, 190 F.3d at 1132, 1134 (assigning employee to do light duty for three years did not make that light-duty assignment permanent);

*Allen v. Georgia Power Co.*, 980 F.Supp. 470 (N.D.Ga.1997) (assigning employee light-duty tasks of original position for two and a half years did not make the employee's assignment doing available light-duty tasks permanent).

Williams' best case would have been *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir.1998). There, Excel's employees with permanent medical restrictions brought a class action lawsuit alleging that Excel's practice of laying off and terminating such employees violated the ADA. *See id.* at 687. In reversing the district court's grant of summary judgment for Excel, the Seventh Circuit found that there was a factual issue whether Excel's "light-duty" jobs were temporary or permanent for purposes of accommodating the permanently restricted employees. *See id.* at 697–98. The Seventh Circuit noted Excel had already created specific light-duty jobs in the collective bargaining agreement. Because those jobs already existed before the employee was ever injured but were not designated as "permanent" or "temporary," the Seventh Circuit found a factual issue as to whether the employee was placed in a truly temporary light-duty position or whether that "injured employee was placed [in] a vacant permanent job." *Id.* at 697. The Seventh Circuit noted that the focus was not of the length of time the employer allowed the employee to continue doing light-duty work. *See id.* (noting that "the temporary nature of a light-duty program should not be adjudged by the absoluteness of the time period in which an injured employee may participate"). Rather, the Seventh Circuit instructed district courts to focus on whether the job into which the injured employee was reassigned was "truly temporary" or really "a *vacant, permanent* job" which implies that such a job already existed before the employee was injured. *See id.* (emphasis added). This reading of

*Hendricks–Robinson* is in accord with how other courts have, in the past, treated this issue. *See, e.g., Norsworthy,* 202 F.3d 269 (an employee's makeshift position that was not a *"previously-existing vacant* position" and was created *only* to accommodate an employee's temporary condition is presumed to be a temporary position); *Clark v. Central Cartage Co.,* 73 F.3d 361, 1995 WL 758459, *4 n. 2 (6th Cir.1995) (Table); *Johnson v. Loram Maintenance of Way, Inc.,* 83 F.Supp.2d 1007, 1014 (D.Minn. 2000).[11]

Here, Williams has offered no evidence—or even argued—that Eastside intended his part-time light-duty assignments to be permanent. Unlike *Hendricks–Robinson,* there is no evidence that Eastside may have had available preexisting light-duty positions into which Williams might have been reassigned. *See Pfeifer v. Caterpillar Inc.,* 2000 WL 310312, *6 (N.D.Ill. Mar.24, 2000) (reasoning that it did "not believe that *Hendricks–Robinson* stands for the proposition that a plaintiff is entitled to a trial on an ADA claim merely because his employer offers temporary positions of indefinite duration to disabled employees"). Simply because Eastside had no absolute cut-off date for the light-duty assignments it gave Williams to accommodate his temporary condition does not mean that Eastside created a new permanent light-duty job for him. *See Amadio,* 238 F.3d at 929–930 (noting

that "if an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity' ").

■ Evidence that a light-duty assignment is permanent would have consisted of evidence that an employer allowed its employee to continue doing light-duty assignments *after* knowing that the employee was *permanently,* medically restricted from ever again working in his original position, *see Taylor v. Garrett,* 820 F.Supp. 933, 934 (E.D.Pa.1993) (employer allowed employee to continue light-duty work after the employee's physician "requested official reclassification given his view that [the employee's] back injury was permanent and that he could never again return to work" in his former position), or where there is evidence that the employer already had a *de facto* permanent light-duty position that existed *before* the injured employee was assigned to it, *see Valdez v. Albuquerque Public Schools,* 875 F.Supp. 740, 742, 744 (D.N.M.1994) (stressing that the permanent light-duty supervisor position, into which the employee was transferred for two years, already existed before the reassignment). Here, Williams has not directed this Court to any evidence that Eastside knew he was permanently, medically restricted when it placed him on light duty, or that Eastside already had a *de facto* permanent light-duty position that existed before Williams came back to work

---

**11.** This reading is also consistent with the recent Seventh Circuit decision of *Basith v. Cook County,* 241 F.3d 919 (7th Cir.2001). There, the plaintiff's original position required him to make deliveries. After coming in to his employer with walking restrictions, his employer created and offered a new position to him that would not require him to make deliveries. *See id.* at 930 ("at the time Hays created a position for Basith"). The plaintiff accepted. The Seventh Circuit found that the employer's creation of the new position was really an offer to restructure the

plaintiff's job functions and eliminate the ones he could not presently perform (*i.e.,* delivery). So placing the plaintiff in the new position, which did not require delivery, did not eliminate delivery as an essential job function of the plaintiff's original position, which did require delivery. The Seventh Circuit correctly reasoned that it would be unwise "to consider the special assignment as proof that delivery was not an essential function because it would punish [the employer] for going beyond the ADA's requirements." *Id.*

after surgery and into which he was transferred.

As already stated, this entire discussion is unnecessary inasmuch as Williams' failed to develop any legal argument with respect to this issue. Like the Seventh Circuit, this Court is not obliged to construct the plaintiff's best argument for him and find good case law to support his citation-free argument. As such, this Court must evaluate Williams with respect to his position as a Driver/Warehouseman. Because Williams has not shown that he can perform the most essential function of that job (*i.e.*, heavy lifting), he cannot show that he is a "qualified individual." Therefore, he cannot establish a *prima facie* failure to accommodate case, and Williams' failure to accommodate claim is dismissed.

This Court rejects Williams' only additional argument that Eastside violated the ADA by failing to sufficiently engage Williams in the interactive process. As the Seventh Circuit has consistently held, "the failure to engage in the interactive process by itself does not give rise to relief." *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir.2001) (citing *Rehling v. City of Chicago*, 207 F.3d 1009, 1014–15 (7th Cir.2000)). Only if the plaintiff can show that there was an accommodation that was reasonable (*e.g.*, a reassignment to a permanent, vacant position that existed within the company) will a court question "whether the failure to provide that accommodation was due to a breakdown in the interactive process." *Id.* Otherwise, "the breakdown of the interactive process would be academic." *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000).

Here, Williams has adduced no evidence that there was any vacant position at any Eastside location, let alone one for which he was qualified. *See id.* In fact, the only accommodation that Williams asserts that would be reasonable is that

Eastside make his temporary light-duty assignment permanent. However, the ADA does not require employers to convert temporary light-duty assignments into permanent ones. *See Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 680 (7th Cir.1998) (citing *McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1165 (7th Cir.1997)). Because Williams fails to point to any reasonable accommodation that Eastside could have given him, any perceived failure on the part of Eastside to actively engage in the interactive process would not, by itself, entitle Williams to relief. Therefore, this argument is rejected.

### B. *The ADA Retaliation Claim*

Williams asserts an independent claim that his employment was terminated in retaliation for his requesting an accommodation. He may assert such a claim even if the underlying disability claim fails. *See Mesnick v. General Elec., Co.*, 950 F.2d 816, 827 (1st Cir.1991).

Employers cannot discriminate in employment practices against any individual because that individual has opposed any act or practice made unlawful by the ADA Title I, 42 U.S.C. §§ 12111–12117, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce any provision of Title I or its implementing regulations (29 C.F.R. Part 1630). *See* 42 U.S.C. § 12203(a); 29 C.F.R. § 1630.12(a). A *prima facie* case of retaliation under the ADA requires the plaintiff to show that: (1) he was engaged in activity protected by the ADA; (2) he suffered an adverse employment action; and (3) there exists a causal connection between the protected activity and the adverse employment action. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir.2001). With respect to the adverse

employment action, Williams was placed on inactive status on September 1, 1998, and was fired on April 6, 1999.[12]

Here, the only claim Williams advances is that Eastside either placed him on inactive status or fired him because he made a request for a reasonable accommodation; this is the essence of his retaliation claim. The "protected activity" in which Williams argues he was engaged was requesting an accommodation. Therefore, the first question, which the parties really do not address, is whether an individual's initial request for a reasonable accommodation constitutes "protected activity" under the ADA?[13]

Some courts, including ones within this circuit, doubt whether it would if courts looked to the statute's language. *See Jolliffe v. First Nat. Bank and Trust*, 2000 WL 1911882, *4 (S.D.Ind.2000) ("A strict interpretation of the ADA does not lead to the conclusion that a request for a reasonable accommodation is a protected activity."); *Sharp v. American Tel. & Tel. Co.*, 2000 WL 970665, *7 (N.D.Cal.2000) (questioning whether plaintiff "requests for accommodation ... constitute a protected activity"). However, noting that "[t]he Seventh Circuit and district courts in this circuit ... have treated a request for an accommodation as statutorily protected activity," the district court in *Jolliffe* made the same assumption that the Seventh Circuit had (*i.e.*, requesting a reasonable accommodation is a "protected activity"), but it did so with reservations.

Other courts believe an individual's request for a reasonable accommodation is a "protected activity." One court of appeals admits that, if it was forced to interpret the actual language of the statute, it would be questionable whether simply making a request for a reasonable accommodation is "protected activity":

> It is questionable whether [the employee] fits within the literal language of the statute: he filed no charge, nor participated in any investigation. Moreover, he did not literally oppose any act or practice, *but simply requested an accommodation,* which was given.

*Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997) (emphasis added). Finding no support in the language of the statute, the *Soileau* court resorted to using legislative intent to divine implicit congressional intent that such conduct be protected:

> It would seem anomalous, however, to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge. This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation. And so, without addressing the issue any further, we will assume *arguendo* that Soileau's request brings him within the coverage of 42 U.S.C. § 12203(a).

---

**12.** Williams' briefing is again lacking. Williams has abandoned the retaliation claim based on Eastside's failure to provide him with enough light-duty work, presumably because it was meritless anyway (*See, e.g.,* Doc. 23, ¶ 59, "Williams knows of no instance where he was ever denied available warehouse work while on light duty.").

**13.** The ADA defines prohibited discrimination to include "not making reasonable accommo-

dations." 42 U.S.C. § 12112(b)(5)(A). Thus, an employee's *opposition* to his employer's denial of his request for a reasonable accommodation or *opposition* to his employers' failure to make reasonable accommodations would certainly be protected activity. *See* 42 U.S.C. § 12203(a); 42 U.S.C. § 12112(b)(5)(A). The issue here is whether *requesting* a reasonable accommodation constitutes "protected activity."

*Id.* Another court appears to have found a "right granted or protected" by the ADA is the right to request a reasonable accommodation. *See McClurg v. GTECH Corp.,* 61 F.Supp.2d 1150, 1162 (D.Kan.1999).

The large majority of courts simply assume, without explanation, that initially requesting a reasonable accommodation is a "protected activity." Many of the recent decisions in this category cite earlier decisions as support for this proposition. However, in the earlier decisions, the courts simply assumed that requesting a reasonable accommodation was "protected activity" without providing much in the way of legal reasoning. *See Conley v. United Parcel Service,* 88 F.Supp.2d 16, 20 (E.D.N.Y.2000) (noting that, because "the courts have generally recognized that non-disabled individuals who request reasonable accommodation are protected against retaliation, provided the request was made in good faith," it would too) [14]; *Weigert v. Georgetown University,* 120 F.Supp.2d 1, 16 n. 15 (D.D.C.2000) (noting that the *Soileau* court held that "[r]equesting an accommodation for a disability *may* also be a protected activity"); *Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1136 (8th Cir. 1999) (assuming, without explanation, that requesting a reasonable accommodation is a protected activity); *Sharp,* 2000 WL 970665, *9 (same); *Patton v. AFG Industries, Inc.,* 92 F.Supp.2d 1200, 1203 (D.Kan.2000) (same); *Walborn v. Erie County Care Facility,* 150 F.3d 584, 588– 89 (6th Cir.1998) (same); *Cruz v. McAllister Bros., Inc.,* 52 F.Supp.2d 269, 287 (D.Puerto Rico 1999) (same); *Barker v. Int'l Paper Co.,* 993 F.Supp. 10, 16 (D.Me. 1998) (same); *Soileau v. Guilford of Maine, Inc.,* 928 F.Supp. 37, 52 (D.Me. 1996), *aff'd,* 105 F.3d 12 (1st Cir.1997); *Cardona v. United Parcel Service,* 79 F.Supp.2d 35, 40 (D.Puerto Rico 2000) (noting that *Soileau* and *Kiel* have "assumed that a request for a reasonable accommodation constitutes protected conduct" and so "[t]he Court will make a similar assumption"); *Giles v. General Elec. Co.,* 1999 WL 202573, *6 (N.D.Tex. 1999) (similar).

Because the Seventh Circuit has in the past treated an individual's request for an accommodation as statutorily protected activity, *see Silk v. City of Chicago,* 194 F.3d 788, 800–01 (7th Cir.1999) ("to satisfy the third prong of the prima facie test, the Sergeant must demonstrate a causal link between the protected expression, namely the accommodation sought for his disability, and the adverse action"), and presumably would continue to, *see Contreras v. Suncast Corp.,* 237 F.3d 756, 765 (7th Cir. 2001) (affirming district court's summary judgment on employee's ADA retaliation claim, because he had "done nothing to establish that his ... request for accommodations even factored into [his employer's] decision to dismiss him"), this Court

**14.** The *Conley* court noted that "the courts have generally recognized" that requesting an accommodation is a "protected activity." In support, the *Conley* court relies on *Muller v. Costello,* 1996 WL 191977 (N.D.N.Y.1996). *Franklin v. Consolidated Edison Co. of New York, Inc.,* 1999 WL 796170, *15 n. 3 (S.D.N.Y. Sep.30, 1999) also assumes that requesting an accommodation is "protected activity" relying on *Sacay v. Research Foundation of City University of New York,* 44 F.Supp.2d 496, 504 (E.D.N.Y.1999), which relied on the *Muller* case. However, *Muller* is devoid of any legal reasoning whatsoever. The only mention it made on the topic consisted of two sentences unsupported by any authority: "Under the first element, plaintiff alleges that he engaged in protected activity by requesting reasonable accommodation for his asthmatic reaction to secondhand tobacco smoke. The Court finds that plaintiff alleges sufficient facts to satisfy the first element of his claim." *Muller* fails to explain why it reached the decision it did—the most important part of legal reasoning.

will do the same. *See Jolliffe*, 2000 WL 1911882, *4 (summarizing cases).[15]

Assuming that requesting a reasonable accommodation is "protected activity," this Court must then determine which exact request Williams is arguing he made which resulted in either his placement on inactive status or ultimate termination.

Eastside first notes that it placed Williams on inactive status on September 1, 1998, only after it had learned that Williams had a new herniated disk requiring more surgery. Eastside claims that there is no evidence that Williams made any accommodation requests around the time of September 1, 1998. Eastside argues that Williams himself admitted never informing Eastside that he had an additional aggravating injury on the date he was placed on inactive status (Williams Dep. at p. 212, 214). Second, Eastside argues that there is no evidence that Williams requested any additional accommodation between September 1, 1998 (date placed on inactive status) and April 6, 1999 (date terminated). Eastside notes that Williams admitted that he never made any additional request for an accommodation to Eastside, told anyone at Eastside that there was a job there that he could do, or asked for an office job (Williams Dep. at p. 146–47). In sum, Eastside argues that "[w]holly absent from this factual scenario is any evidence of a requested accommodation" in or around the time he was placed on inactive status or fired (Doc. 21 at 11).

In a two-paragraph response, Williams calls Eastside's conduct the "classic example of retaliation" (Doc. 25 at 9). He claims that he specifically asked Eastside to let him continue loading and delivering sheet rock (Doc. 25 at 9). He argues that "[t]he timing and the action taken provide the necessary circumstantial evidence from which a trier of fact might infer that the employer acted with an improper motive" (Doc. 25 at 9).

■■■ Williams has not shown a sufficient causal relation to any protected conduct in which he engaged (*i.e.*, any specific request for an accommodation) and, as Williams calls it, "the action" (which presumably is either the September 1, 1998, placement on inactive status or the April 6, 1999, termination). Williams' entire summary judgment defense is that the temporary proximity between some specific request he made to Eastside to let him continue loading and delivering the sheet rock and "the action" is so close that a jury could infer that one caused the other. However, Williams admits that Eastside "faithfully honored" Williams' lifting restrictions and "never asked Williams to exceed them" (Doc. 23, ¶ 58). Strangely, while Williams is relying solely on his temporal proximity argument, he fails to cite any specific date he actually requested that Eastside let him continue loading and delivering the sheet rock. It is unclear how Williams wants this Court to measure temporal proximity when Williams has not specified what specific request he is talking about or on what date it was made. Because Williams failed to cite to a specific date of a requested accommodation, this Court cannot even begin to embark on any temporal proximity analysis because it would require this Court to determine the timing between one date-certain event and another event that has no date at all.[16]

---

**15.** This Court notes that, to the extent that Williams was requesting to remain on light-duty indefinitely, this was not a request for a *reasonable* accommodation. It is even more doubtful whether the ADA anti-retaliatory provisions would consider requesting unreasonable accommodations as "protected activity."

**16.** To the extent Williams is arguing that this Court should consider his first request for an accommodation back in July of 1996, which was faithfully honored, as being implicitly and automatically renewed on a daily basis for purposes of any temporal proximity analysis, this Court rejects it as undeveloped and unconvincing. Adopting such an argument

The only apparent time Williams requested an accommodation was back in July of 1996. The timing between his July, 1996, request and either of the two adverse employment actions (the September 1, 1998, placement on inactive status, or the April 6, 1999, termination) is too weak to create an inference that Williams was retaliated against for making the July, 1996, request. *See Sweeney v. West,* 149 F.3d 550, 556 (7th Cir.1998) (a suspicious "temporal sequence" is one that follows fairly soon after the employee's protected expression, like a day or maybe a week); *Contreras,* 237 F.3d at 765 (noting that "absent other evidence of retaliation, a temporal relation is insufficient evidence to survive summary judgment").

Really, the only evidence Williams believes would preclude summary judgment on the temporal proximity issue is page 34 of a deposition given by his vocational rehabilitation counselor, Fran Whipps (Doc. 23 at p. 9). There, Whipps states that Williams said he probably was not going to participate in job searching activities. So Whipps did not initiate any further ones. To the extent that Williams claims his conversation *with Whipps* [17] about whether he thought he could continue job searching activities translated into a formal request *to Eastside* that Eastside allow him to load and deliver sheet rock assignments, presumably indefinitely, this Court rejects it. This reading of the Whipps' actual deposition testimony goes too far and is simply unreasonable. Williams made no such request, and *he* was not engaged in "protected activity"

would ensure all accommodation requests continue indefinitely, and there would always be temporal proximity between the request date and the date of the adverse employment action.

17. Williams' purported request was never made to Eastside. Though Williams claims that Eastside hired Whipps (Doc. 23, at p. 4,

when *someone else* (*i.e.,* Fran Whipps) alerted Eastside of a possible aggravation of Williams' injury. *See Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361 (11th Cir.1999). Page 34 of Whipps' deposition testimony does not preclude summary judgment.

Williams cites some other evidence indicating that Eastside Manager David Reis placed him on inactive job status because of his disability (Reis Dep. at pp. 114, 115). But where is the specific instance of "protected activity" in which Williams was engaged? Williams is attempting to season his retaliation claim with disparate treatment allegations. However, any successful disparate treatment claim would require Williams to first show he was a "qualified individual," something this Court has already found Williams cannot do. *See Sieberns v. Wal–Mart Stores, Inc.,* 125 F.3d 1019, 1021–22 (7th Cir.1997). Simply having a disability or being placed on inactive status or fired because of a disability is not the same as saying an individual was engaged in a "protected activity."

Even assuming that plaintiff was somehow engaged in protected activity by refusing Whipps' help, Williams' claim still fails. The defendants have produced a legitimate, nondiscriminatory reason for the adverse employment decision: the plaintiff's inability to perform the essential job functions of the Driver/Warehouseman position and the aggravation of that injury which required even more surgery. This Court has already discussed at length the essential functions of a Driver/Warehouse-

¶ 10), he fails to cite any supporting record evidence (Doc. 24, at p. 11, ¶ 17). This Court declines on scouring the record to see whether any other document or deposition on file would support this assertions. That was Williams' job. *See Basith,* 241 F.3d at 928–29 (conclusory allegations unsupported by record citations do not preclude summary judgment).

man. This Court has also addressed Williams' debilitating back injury which prevented him from performing the most essential function of that job: heavy lifting. And it is clear that employers do not have to continue a temporary light-duty arrangement indefinitely, especially where the debilitating injury is getting worse. *See Myers v. Hose,* 50 F.3d 278, 283 (4th Cir.1995) (holding that a "reasonable accommodation does not require [an employer] to wait indefinitely for [the employee's] medical conditions to be corrected ...."); *cf. Amadio v. Ford Motor Co.,* 238 F.3d 919, 929–930 (7th Cir.2001) (citing *Myers* ). Williams does not argue that he could perform the essential job functions of the Driver/Warehouseman position or that Eastside was not informed that Williams' condition was getting worse. Therefore, Williams has not shown that the legitimate, nondiscriminatory reason Eastside articulated for placing him on inactive status and firing him after he was unable to produce a full medical release was in any way pretextual. *See Silk,* 194 F.3d at 799; *Basith,* 241 F.3d at 933; *Moody v. Blue Cross/Blue Shield of Michigan,* 993 F.Supp. 1078, 1084 (W.D.Mich.1998); *Miller v. California Dept. of Corrections,* 1998 WL 917525, *6 (N.D.Cal. Dec.30, 1998), *aff'd,* 225 F.3d 663, 2000 WL 689585 (9th Cir.2000).

## C. *State Retaliatory Discharge Claim*

 Williams' remaining claim is one for the state law tort of retaliatory discharge. Jurisdiction over this claim hinged on the supplemental jurisdiction provisions of 28 U.S.C. § 1367(a). Under the supplemental jurisdiction statute, a district court "may decline to exercise supplemental jurisdiction" over pendent state law claims if they have dismissed all claims over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). "In an ordinary case of supplemental jurisdiction, the pre-

sumption is in favor of relinquishment when the claim that is within the original jurisdiction of the district court is dismissed before trial." *Alonzi v. Budget Const. Co.,* 55 F.3d 331, 334 (7th Cir.1995) (citing *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir. 1993)); *Disher v. Information Resources, Inc.,* 873 F.2d 136, 140 (7th Cir.1989). Put another way, in a removal case, like this one, once the federal claims drop out prior to trial and the court declines to exercise supplemental jurisdiction over the remaining state law claims, the court should generally remand the case back to state court. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351–352, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Decatur Mem'l Hosp. v. Connecticut Gen. Life Ins. Co.,* 990 F.2d 925, 928 (7th Cir.1993).

In this case, the potential federal underpinning for this state law claim has been removed. While the underlying ADA claims dealt with disability discrimination, the state law claim involves issues related to retaliation against a worker for exercising his worker's compensation rights. This Court sees no reason to oust the Illinois state court of origin from the opportunity to adjudicate this claim under local law. *See Carnegie–Mellon,* 484 U.S. at 351–53, 108 S.Ct. 614; *Digiacomo v. Ameritech,* 2000 WL 152141, *3 (N.D.Ill. Feb.4, 2000). Thus, this Court exercises its discretion to decline supplemental jurisdiction over the remaining state law claim and remands the case back to the state court for disposition of Count 3 (state law retaliatory discharge tort). *See* 28 U.S.C. § 1447(c).

## IV. *CONCLUSION*

For the following reasons, Eastside's motion for summary judgment is **GRANTED** as to Counts 1 and 2, and those counts are **DISMISSED with prejudice.** The

case is **ORDERED REMANDED** the Circuit Court of Williamson County for the disposition of the remaining count in Williams' complaint (Count 3).

**IT IS SO ORDERED.**